# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN - SOUTHERN DIVISION

**ERIKA DAVIS**

           **Plaintiff,**

**v.**

**Lead Case No.:**      **1:17-cv-00029**

**Member Case Nos.:  1:17-cv-00684**

**Hon. Gordon J. Quist**

**Complaint and Reliance on Jury Demand**

**MICHIGAN STATE UNIVERSITY; THE BOARD  OF TRUSTEES OF MICHIGAN STATE UNIVERSITY; LAWRENCE GERARD NASSAR (individual capacity only); KATHIE KLAGES (individual capacity only); WILLIAM D. STRAMPEL, D.O. (individual capacity only); JEFFREY R. KOVAN D.O. (individual capacity only); DOUGLAS DIETZEL, D.O. (individual capacity only); BROOKE LEMMEN, D.O. (individual capacity only); GARY E. STOLLAK (individual capacity only); DESTINY TEACHNOR-HAUK (individual capacity only); USA GYMNASTICS, INC.; TWISTARS USA, INC. d/b/a GEDDERTS' TWISTARS USA GYMNASTICS CLUB, and JOHN GEDDERT,**

           **Defendants.**

**Brian J. McKeen (P34123)**
**Steven C. Hurbis (P80993)**
McKeen & Associates, P.C.
Attorneys for Plaintiff
645 Griswold Street
Suite 4200
Detroit, MI 48226
Ph.: (313) 961-4400
E:bjmckeen@mckeenassociates.com
E:shurbis@mckeenassociates.com

**Jordan K. Merson**
To Be Admitted **Pro Hac Vice**
Merson Law, PLLC
Attorneys for Plaintiff
150 East 58th Street, 34th Floor
New York, NY 10166
Ph: (212) 603-9100
E: jmerson@mersonlaw.com

**Krystal A. Crittendon, Esq. (P49981)**

**Patrick Fitzgerald**
**Amy Van Gelder**
**Albert L. Hogan**
Skadden, Arps, Slate, Meagher & Flom LLP
Attorneys for Defendants Michigan State
University and the Board of Trustees of
Michigan State University
155 N. Wacker Drive
Chicago, IL 60606
Ph.: (312) 407-0700
Fax: (312) 407-0411
E: Patrick.Fitzgerald@skadden.com
E: Amy.VanGelder@skadden.com
E: Al.Hogan@skadden.com

**Scott R. Eldridge (P66452)**
**Megan P. Norris (P39318)**
**Brian M. Schwartz (P69018)**
Miller, Canfield, Paddock and Stone, PLC
Attorneys for Defendants Michigan State
University and the Board of Trustees of
Michigan State University
1 E. Michigan Ave. Ste. 900
Lansing, MI 48933-1370
Ph.: (517) 483-4918
Fax: (517) 374-6304
E: eldridge@millercanfield.com
E: norris@millercanfield.com
E: schwartz@millercanfield.com

**D. Andrew Portinga (P55804)**
**David J. Gass (P34582)**
**Rebecca L. Strauss (P64796)**
Miller Johnson PLC
Attorneys for Defendant USA
Gymnastics, Inc.
45 Ottawa SW, Ste. 1100
P.O. Box 306
Grand Rapids, MI 49501-0306
Ph.: (616) 831-1700
Fax: (616) 988-1772
E: portingaa@millerjohnson.com
E: gassd@millerjohnson.com
E: straussr@millerjohnson.com

**Cameron R. Getto (P57300)**
Zausmer August & Caldwell, P.C.
Attorneys for Defendant Twistars USA, Inc.
d/b/a Gedderts' Twistars USA Gymnastics
Club
31700 Middlebelt Rd., Ste. 150
Farmington Hills, MI 48334
Ph.: (248) 851-4111
Fax: (248) 851-0100
E: cgetto@zacfirm.com

**Peter D. Cronk, Jr. (P60172)**
Plunkett Cooney
Co-Counsel for Defendant Stolak
325 E. Grand River Ave Ste 250
East Lansing, MI 48823
Ph: (517) 324-5611
E: pcronk@plunkettcooney.com

**Steven F. Stapelton (P51571)**
**Marshall W. Grate (P37728)**
Clark Hill PLC
Attorney for Defendants Klages, Strampel,
and Kovan
200 Ottawa Ave. NW Ste 500
Grand Rapids, MI 49503
Ph: (616) 608-1145
E: Sstapleton@clarkhill.com
E: mgrate@clarkhill.com

**Katherine Nighswander (P77928)**
Law Offices of Scott L. Feuer P.C.
Co-Counsel for Defendant Stolak
888 W. Big Beaver Rd. Ste 850
Troy, MI 48084
Ph: (248) 723-7828 ext 203
E: knighswander@fklawyers.com

**TABLE OF CONTENTS**

THIRD AMENDED COMPLAINT AND JURY DEMAND                                    1

I. PRELIMINARY STATEMENT AND INTRODUCTION                                  1

II. JURISDICTION AND VENUE                                                 7

III. PARTIES AND KEY INDIVIDUALS                                           9

IV. COMMON FACTUAL ALLEGATIONS                                            14

V. SPECIFIC FACTUAL ALLEGATIONS                                           36

      A. ERIKA DAVIS                                                36

VI. FRAUDULENT CONCEALMENT                                                40

      A. THE MSU DEFENDANTS                                        48

      B. DEFENDANT USA GYMNASTICS                                  52

      C. DEFENDANTS TWISTARS AND GEDDERT                           57

VII. CLAIMS AGAINST MICHIGAN STATE UNIVERSITY DEFENDANTS                  61

      A. COUNT ONE – Violations of Title IX                        61

      B. COUNT TWO – Violations of Civil Rights, 42 U.S.C. §1983   67

      C. COUNT THREE -- Failure to Train and Supervise, 42 U.S.C. §1983   69

      D. COUNT FOUR – Gross Negligence                             76

      E. COUNT FIVE – Negligence                                   78

      F. COUNT SIX – Vicarious Liability                           80

      G. COUNT SEVEN – Express/Implied Agency                      82

      H. COUNT EIGHT – Negligent Supervision                       84

      I. COUNT NINE – Negligent Failure to Warn or Protect         85

J. COUNT TEN– Negligent Failure to Train or Educate        87

K. COUNT ELEVEN– Negligent Retention        90

L. COUNT TWELVE – Fraud and Misrepresentation        91

M. COUNT THIRTEEN - Violations of Elliot-Larsen Civil Rights Act        93

VIII. CLAIMS AGAINST USA GYMNASTICS        95

A.  COUNT FOURTEEN – Civil Rico; Violation of 18 U.S.C. §1964        97

B. COUNT FIFTEEN – Gross Negligence        98

C. COUNT SIXTEEN – Negligence        100

D. COUNT SEVENTEEN – Vicarious Liability        102

E. COUNT EIGHTEEN – Express/Implied Agency        103

F. COUNT NINETEEN – Negligent Supervision        105

G. COUNT TWENTY – Negligent Failure to Warn or Protect        106

H. COUNT TWENTY-ONE – Negligent Failure to Train or Educate        107

I. COUNT TWENTY-TWO – Negligent Retention        108

J. COUNT TWENTY-THREE - Fraud and Misrepresentation        109

IX. CLAIMS AGAINST TWISTARS        111

A. COUNT TWENTY-FOUR – Gross Negligence        111

B. COUNT TWENTY-FIVE – Negligence        112

C. COUNT TWENTY-SIX – Express/Implied Agency        112

D. COUNT TWENTY-SEVEN – Negligent Supervision        116

E. COUNT TWENTY-EIGHT – Negligent Failure to Warn or Protect        117

F. COUNT TWENTY-NINE – Fraud and Misrepresentation        119

X. CLAIMS AGAINST NASSAR        122

A. COUNT THIRTY – Assault and Battery                                        122

B. COUNT THIRTY-ONE – Invasion of Privacy                            123

XI. CLAIMS AGAINST KLAGES, STRAMPEL, KOVAN, AND STOLLAK          124

A. COUNT THIRTY-TWO – Failure to Report Child Abuse          124

XIII. DAMAGES                                                                              131

REQUEST FOR RELIEF                                                                134

JURY DEMAND                                                                             136

---

### COMPLAINT AND JURY DEMAND

---

**NOW COMES** Plaintiff, by and through her attorney, McKeen and Associates, P.C. and Merson Law, PLLC, and hereby alleges and states as follows:

## I.      PRELIMINARY STATEMENT AND INTRODUCTION

1.      This is a civil action for declaratory, injunctive, equitable, and monetary relief for injuries sustained by Plaintiff as a result of the acts, conduct, and omissions of Lawrence Nassar, D.O., Michigan State University ("MSU"), USA Gymnastics, Inc. ("USAG"), and Twistars USA, Inc. ("Twistars") and their respective employees, representatives, and agents, relating to rape, sexual assault, abuse, molestation, and nonconsensual sexual touching and harassment by Defendant Nassar against Plaintiff who was a minor when the sexual assaults took place.

2.      Many of the victims are or were young athletes participating in gymnastics.

3.      Defendant Nassar came highly recommended to Plaintiff as a renowned orthopedic sports medicine physician, purportedly well-respected in the sports medicine community, specifically in the sports community as the Team Physician for the United States Gymnastics team.

4.      Plaintiff had no reason to suspect Defendant Nassar was anything other than a competent and ethical physician.

5.      From approximately 1992 to 2016 Defendant Nassar worked for Michigan State University in various positions and capacities.

6.      From 1986 to approximately 2015 Defendant Nassar also worked for USA Gymnastics in various positions and capacities.

7.   For over 20 years, Defendant Nassar had unfettered access to young female athletes through the Sports Medicine Clinic at MSU, and through his involvement with USAG and Twistars, who referred athletes to his care.

8.   To gain Plaintiff's trust, at appointments, Defendant Nassar would convince Plaintiff that he was helping her.

9.   Between 1992 and 2016, under the guise of medical study and medical treatment, Defendant Nassar raped, sexually assaulted, abused, and molested Plaintiff, by nonconsensual vaginal and anal digital penetration or by rubbing and sucking on her breasts, and without the use of gloves or lubricant.

10.  Plaintiff was seeking treatment for various pain and functional complaints, such as knee pain and other similar injuries and conditions.

11.  In 1997 or 1998, Larissa Boyce, named in a separate complaint, reported to MSU gymnastics coach Kathie Klages concerns regarding Defendant Nassar's conduct and "treatment," but Defendant Klages dissuaded the athlete from completing a formal report by warning Larissa that the report would have serious consequences for her and Nassar.

12.  As a result of Defendant Klages being informed about Nassar's conduct, at least one other athlete, identified in additional pleadings, was asked by Klages if Nassar had performed the "procedure" involving digital vaginal and anal penetration on that athlete, who responded in the affirmative. Defendant Klages told the athlete that there is no reason to bring up or otherwise report Nassar's conduct.

13.  In 1999, a MSU student athlete, reported to trainers and her coach who were employees of MSU concerns about Defendant Nassar's conduct and "treatment," yet MSU failed to take any action in response to her complaints.

14.     In 2000, another MSU student athlete reported to trainers concerns about Defendant Nassar's conduct and "treatment," yet again MSU failed to take any action in response to her complaints.

15.     Many victims were seen alone with only the individual victim and Defendant Nassar in the room, without chaperones or parents.

16.     At other times, Defendant Nassar would position himself in a manner in which parents or chaperones in the room could not see his conduct.

17.     Because MSU took no action to investigate the 1997 or 1998, 1999, or 2000 complaints and took no corrective action, from 1998 to 2016, many victims were minors, were also sexually assaulted, abused, and molested by Defendant Nassar by nonconsensual vaginal and anal digital penetration, nonconsensual sexual touching of the vaginal area without the use of gloves or lubricant and by nonconsensual touching and groping of their breasts under the guise of treatment.

18.     While most victims were assaulted at MSU, other victims were assaulted at USAG sanctioned events, Twistars, and Defendant Nassar's home in Holt, Michigan.

19.     The ages of the victims when assaulted ranged from approximately 10 to 34 years old.

20.     Additional complaints regarding Defendant Nassar's conduct surfaced in 2014. Amanda Thomashow reported she had an appointment with Defendant Nassar to address hip pain and was sexually abused and molested by Defendant Nassar when he cupped her buttocks, massaged her breast and vaginal area, and became sexually aroused.[1]

21.     Upon information and belief, Defendant MSU investigated the 2014 complaints through

---

[1] *See*, At MSU: Assault, harassment and secrecy. Matt Mencarini, December 15, 2016. Available at, http://www.lansingstatejournal.com/story/news/local/2016/12/15/michigan-state-sexual-assault-harassment-larry-nassar/94993582/. (Last accessed January 5, 2017).

their Office of Institutional Equity, and although the victim reported to Defendant MSU certain facts, some were omitted from the investigative report including but not limited to the following:

    a. Defendant Nassar was sexually aroused while touching her;

    b. The appointment with Defendant Nassar did not end until Amanda Thomashow physically removed his hands from her body.

22. Three months after initiating the investigation, in July 2014, Amanda Thomashow's complaints were dismissed and Defendant MSU determined she didn't understand the "nuanced difference" between sexual assault and an appropriate medical procedure and deemed Defendant Nassar's conduct "medically appropriate" and "[n]ot of a sexual nature."[2]

23. Following the 2014 investigation, Defendant Nassar became subject to new institutional guidelines, one of which – it is believed – was that Defendant Nassar was not to examine or treat patients alone.[3]

24. Defendant Nassar continued to treat patients alone.

25. Through his position with MSU, his notoriety, and support by USAG and Twistars, Defendant Nassar used his position of authority as a medical professional to abuse Plaintiff without any reasonable supervision by MSU or USAG.

26. Defendant Nassar carried out these acts without fully explaining the "treatment" or obtaining consent of Plaintiff or their parents.

27. All of Defendant Nassar's acts were conducted under the guise of providing medical care

---

[2] *Id.*
[3] *Id.*

at his office at Michigan State University, at Twistars, at USAG sanctioned events, or at his home in Holt, Michigan.

28. The failure to give proper notice or to obtain consent for the purported "treatment" from Plaintiff or her parents robbed them of the opportunity to reject the "treatment."

29. Defendant Nassar used his position of trust and confidence in an abusive manner causing Plaintiff to suffer a variety of injuries including shock, humiliation, emotional distress and related physical manifestations thereof, embarrassment, loss of self-esteem, disgrace, and loss of enjoyment of life.

30. In September 2016, a story was published in the Indianapolis Star regarding a complaint filed with Defendant MSU's Police Department titled "Former USA Gymnastics doctor accused of Abuse," which included Rachel Denhollander's allegations against Defendant Nassar.

31. Following the September 2016 publication, other victims began coming forward after recognizing that they were victims of sexual abuse at a time when most of them were minors.

32. Plaintiff has been forced to relive the trauma of the sexual assaults.

33. In summer 2015, USAG relieved Defendant Nassar of his duties after becoming aware of concerns about his actions, yet USAG failed to inform Michigan State University of the circumstances regarding his dismissal.

34. As early as 1997, representatives of Michigan State University were made aware of Defendant Nassar's conduct, yet failed to appropriately respond to allegations, resulting in the sexual assault, abuse, and molestation of victims through approximately 2016.

35. Michigan State University's deliberate indifference before, during, and after the sexual

assault, abuse, and molestation of Plaintiff was in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, 42 U.S.C. § 1983, as well as other Federal and State laws.

36.     MSU and USAG's failure to properly supervise Defendant Nassar and their negligence in retaining Defendant Nassar was in violation of Michigan common law.

37.     In late November 2016, Defendant Nassar was arrested and charged in Ingham County, Michigan on three charges of first-degree criminal sexual conduct with a person under 13, which is a felony punishable with a maximum penalty of imprisonment for life without the possibility of parole.[4]

38.     In mid-December 2016, Defendant Nassar was indicted, arrested, and charged in Federal Court in Grand Rapids, Michigan on charges of possession of child pornography and receipt/attempted receipt of child pornography.

39.     On February 22, 2017, Defendant Nassar was arraigned on 22 counts of first-degree criminal sexual conduct with a person under 13 years old, and 14 counts of third-degree criminal sexual conduct with a person under the age of 13 years old in Ingham County, Michigan[5] and Eaton County, Michigan.[6]

40.     The acts, conduct, and omissions of Defendants Michigan State University, USA Gymnastics, and Twistars, and their policies, customs, and practices with respect to investigating sexual assault allegations severely compromised the safety and health of

---

[4] *People v. Nassar*, State of Michigan, Ingham County Circuit Court Case No. 17-143-FC.
[5] *People v. Nassar*, Ingham County District Court Case No. 17-00425-FY, *see also*, http://www.michigan.gov/documents/ag/Nassar_affidavit_Ingham_County_charges_Feb._2017_552531_7.pdf
[6] *People v. Nassar*, Eaton County District Court Case No. 17-0318-FY, *see also,* http://www.michigan.gov/documents/ag/Nassar_affidavit_Eaton_County_charges_Feb._2017_552536_7.pdf

Plaintiff and an unknown number of individuals, and have resulted in repeated instances of sexual assault, abuse, and molestation of Plaintiff by Defendant Nassar, which has been devastating for Plaintiff and her family.

41. On or about July 11, 2017, Defendant Nassar pleaded guilty in his federal criminal case to: (1) Receipt and Attempted Receipt of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A); (2) Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B); and (3) Destruction and Concealment of Records and Tangible Objects, in violation of 18 U.S.C. § 1519.

42. On November 11, 2017 Defendant Nassar pleaded guilty to seven counts of first-degree criminal sexual conduct in Ingham County Circuit Court. Defendant Nassar.

43. On November 29, 2017 Defendant Nassar pleaded guilty to three counts of first-degree criminal sexual conduct in Eaton County Circuit Court.

44. On December 7, 2017 Defendant Nassar was sentenced to three twenty-year sentences to be served consecutively on three charges of obtaining and possessing child pornography in the United States District Court for the Western District of Michigan.

45. This action arises from Defendants' blatant disregard for Plaintiff's federal and state rights, and Defendants' deliberately indifferent and unreasonable response to physician-on-patient/physician-on-student sexual assault, abuse, and molestation.

## II.      JURISDICTION AND VENUE

46. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

47. This action is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq*., as more fully set forth herein.

48. This is also an action to redress the deprivation of Plaintiff's constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

49. Subject matter jurisdiction is founded upon 28 U.S.C. § 1331 which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

50. Subject matter jurisdiction is also founded upon 28 U.S.C. § 1343 which gives district courts original jurisdiction over any civil actions authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

51. Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a) to hear and decide claims arising under state law that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

52. The claims are cognizable under the United States Constitution, 42 U.S.C. § 1983, 20 U.S.C. § 1681 *et seq.*, and under Michigan Law.

53. The events giving rise to this lawsuit occurred in Ingham County, Michigan and Eaton County, Michigan both of which sit in the Southern Division of the Western District of Michigan.

54. Venue is proper in the United States District Court for the Western District of Michigan,

pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claim occurred.

55.     Plaintiff has filed a Notice of Intent to File Claim with the Michigan Court of Claims in compliance with MCL 600.6431.

### III.     PARTIES AND KEY INDIVIDUALS

56.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

57.     With the exception of Plaintiff Erika Davis, the names of the Plaintiffs have been withheld from this Complaint to protect their identities they were minor children at the time the sexual abuse occurred.[7]

58.     Plaintiff Erika Davis is a resident of California. She was a minor for at least a portion of the time she was sexually assaulted, abused, and molested by Defendant Nassar.

59.     Defendant Lawrence "Larry" Nassar, was formerly a Doctor of Osteopathic Medicine, and is a resident of Michigan.

60.     Defendant Michigan State University (hereinafter, "Defendant MSU") was at all relevant times and continues to be a public university organized and existing under the laws of the state of Michigan.

61.     Defendant MSU receives federal financial assistance and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a).

62.     Defendant The Board of Trustees of Michigan State University (hereinafter, "Defendant MSU Trustees") is the governing body for Michigan State University.

---

[7] Plaintiff will seek an Order of the Court regarding disclosure of Plaintiff' identities and all conditions for disclosure.

63. Lou Anna K. Simon is the immediate past President of Defendant MSU, appointed in approximately January 2005. Prior to her appointment as President, Ms. Simon held several administrative roles including assistant provost for general academic administration, associate provost, and provost and vice president for academic affairs during her career with MSU.

64. Lou Anna K. Simon resigned her position as President of Defendant MSU on January 24, 2018.

65. John Mathias Engler is the former Governor of the State of Michigan and is currently serving as interim President of Defendant MSU.

66. M. Peter McPherson served as President of Defendant MSU from approximately 1993 – 2004.

67. Mark Hollis is the immediate past Athletic Director of Defendant MSU.

68. Defendant William D. Strampel, D.O. ("Defendant Strampel") was the Dean of the College of Osteopathic Medicine at Michigan State University serving as Dean since approximately April 2002 and as Acting Dean between December 2001 and April 2002. Upon information and belief, in December 2017, Defendant Strampel stepped down from his role as Dean of the College of Osteopathic Medicine for "medical reasons," but Defendant Strampel will remain on the faculty of MSU's College of Osteopathic Medicine.

69. Defendant Jeffrey R. Kovan, D.O. ("Defendant Kovan") is or was the Director of Division of Sports Medicine at Michigan State University and was the supervisor of the Department of Radiology, under which Defendant Nassar practiced medicine.

70. Defendant Douglas Dietzel, D.O. ("Defendant Dietzel") is the Clinical Director of MSU Sports Medicine and Team Orthopedic Surgeon for MSU Department of Intercollegiate

Athletics serving as Clinical Director of MSU Sports Medicine since approximately 2004.

71.   Defendant Brooke Lemmen, D.O. ("Defendant Lemmen") is or was a practicing physician with MSU Sports Medicine from approximately 2010 to 2017.

72.   Defendant Kathie Klages ("Defendant Klages") was the head coach of the Michigan State University Gymnastics Program until her suspension and resignation in early 2017; she also conducted gymnastics classes and programs for children and young adults not on the varsity gymnastics team.

73.   Defendant Klages regularly referred MSU student athletes as well as young athletes who were not MSU students to Defendant Nassar for medical treatment.

74.   Defendant Gary E. Stollak ("Defendant Stollak") was a professor in the clinical program within the Michigan State University Department of Psychology.

75.   Defendant Destiny Teachnor-Hauk ("Defendant Teachnor-Hauk") is or was an athletic trainer for Defendant MSU for various sports including, but not limited to, softball, track and field, gymnastics, rowing, and volleyball.

76.   Defendant Teachnor-Hauk regularly referred MSU student athletes to Defendant Nassar for medical treatment.

77.   Defendant MSU, Defendant MSU Trustees, Defendant Nassar, Defendant Stollak, Defendant Strampel, Defendant Kovan, Defendant Klages, Defendant Dietzel, Defendant Lemmen, and Defendant Teachnor-Hauk are hereinafter collectively referred to as the MSU Defendants unless otherwise specified.

78.   At all relevant times the MSU Defendants maintained employment and offices at Defendant MSU in East Lansing, Michigan.

79.   Defendant United States of America Gymnastics (hereinafter "Defendant USAG") was and

continues to be an organization incorporated in Indiana, authorized to conduct business and conducting business throughout the United States, including but not limited to Michigan.

80. The U.S. Olympic Committee and the International Gymnastics Federation has designated Defendant USAG as the national governing body for the sport of gymnastics in the United States.

81. USAG advertises on its website: "Since 1990—prior to almost all other National Governing Bodies—USA Gymnastics has provided awareness, prevention and reporting information regarding sexual misconduct to professional members, athlete members and their families."[8]

82. Steve Penny was the president of Defendant USAG, named in approximately April 2005, who is currently responsible for the overall management and strategic planning of Defendant USAG. He resigned in March 2017.

83. Robert Colarossi is the past president of Defendant USAG and held the position from approximately 1998 to 2005, and during that time was responsible for the overall management and strategic planning of Defendant USAG.

84. Defendant Twistars USA, Inc. d/b/a Gedderts' Twistars USA Gymnastics Club (hereinafter, "Defendant Twistars") was and continues to be an organization incorporated in Michigan.

85. Defendant John Geddert ("Defendant Geddert") is the owner and operator of Twistars USA, Inc. d/b/a Gedderts' Twistars USA Gymnastics Club.

86. Defendant Twistars is a member club and agent or instrumentality of Defendant USAG.

87. Defendant USAG requires member clubs to pay it a fee in order to hold Defendant USAG

---

[8] https://usagym.org/pages/education/safesport/.

sanctioned events.

88.   Defendant USAG also issues rules and requirements for its member clubs and exercises some degree of control over its member clubs because Defendant USAG has the authority to revoke a club's membership.

89.   Defendant USAG also requires all coaches, judges, and athletes to pay it a membership fee if they want to participate in USA Gymnastics sanctioned events.

90.   As such, Defendant Twistars required all gymnasts interested in competing to become members of Defendant USAG and to pay a membership fee to Defendant USAG.

91.   Club membership in Defendant USAG is a substantial benefit for Defendant Twistars and Defendant Geddert, as membership with Defendant USAG and participation in Defendant USAG sanctioned events is a considerable factor that interested gymnasts consider in joining a gymnastics club—particularly gymnasts who have collegiate, national, or Olympic aspirations in competitive gymnastics.

92.   At all relevant times, Defendant Geddert served as an agent of Defendant USAG and served as the 2011 USA World Championship Team Head Coach and the 2012 USA Olympic Team Head Coach through his affiliations with Defendant USAG and Defendant Twistars.

93.   Defendant Twistars's website states, regarding Defendant Geddert, "Being named Head Coach for the USA Olympic and World Championships Gold Medal Winning team, paints the picture of national respect."

94.   Defendant USAG received a financial benefit through its relationship with Defendants Twistars and Geddert in the form of membership fees and fame.

95.   Defendants Twistars and Geddert received a benefit through its relationship with Defendant USAG in the form of national and global exposure, fame, and increased

enrollment.

## IV.     COMMON FACTUAL ALLEGATIONS

96.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

97.     Plaintiff also incorporates by reference the allegations contained in the various complaints filed in the respective member cases of this consolidated action.

98.     At all relevant times, Defendant Nassar maintained an office at MSU in East Lansing, Michigan.

99.     At all relevant times, Defendants MSU, MSU Trustees, Nassar, Stollak, Strampel, Kovan, Teachnor-Hauk, Klages, and Lemmen were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendant Michigan State University.

100.     At all relevant times, including the years 1992 to 2016, Defendant Nassar was acting in the scope of his employment or agency with Defendant MSU.

101.     At all relevant times, including the years 1996 to 2015, Defendant Nassar was acting in the scope of his employment or agency with Defendant USAG.

102.     At all relevant times, including the years 1992 to 2016, Defendant Nassar was acting in the scope of his agency with Defendant Twistars.

103.     Defendant Nassar graduated from Michigan State University with a Doctor of Osteopathic Medicine degree in approximately 1993.

104.     Defendant Nassar was employed by and/or an agent of Defendant USAG from approximately 1986 to 2015, serving in various positions including but not limited to:

      a.   Certified Athletic Trainer;

      b.  Osteopathic Physician;

      c.  National Medical Director;

      d.  National Team Physician, USA Gymnastics;

      e.  National Team Physician, USA Gymnastics Women's Artistic Gymnastics National Team.

105.   Defendant Nassar received a benefit from his relationship with Defendant USAG in the form of national and global exposure, fame, and increased patients at his office at MSU, which resulted in Defendant Nassar receiving higher compensation.

106.   Defendant USAG received a benefit from its relationship with Defendant Nassar in the form of medical services rendered to its member athletes, national and global exposure, fame, and increased enrollment.

107.   Defendant Nassar was employed by Defendant MSU from approximately 1996 to 2016 in various positions including but not limited to:

      a.  Associate Professor, Defendant MSU's Division of Sports Medicine, Department of Radiology, College of Osteopathic Medicine;

      b.  Team Physician, Defendant MSU's Men's and Women's Gymnastics Team;

      c.  Team Physician, Defendant MSU's Men's and Women's Track and Field Teams;

      d.  Team Physician, Defendant MSU's Men's and Women's Crew Team;

      e.  Team Physician, Defendant MSU's Intercollegiate Athletics;

      f.  Medical Consultant, Defendant MSU's Wharton Center for the Performing Arts;

      g.  Advisor, Student Osteopathic Association of Sports Medicine.

108.   As part of Defendant Nassar's employment and contractual duties with MSU, Defendant Nassar was responsible for spending between 50 to 70% of his time engaged in "Outreach"

and/or "Public Services."

109.   A part of Defendant Nassar's outreach included providing medical treatment to athletes affiliated with Defendants USAG and Twistars as well as other organizations such as Holt High School.

110.   Based on MSU's decision to compensate Nassar for his work with USAG and Twistars, Nassar was acting in the scope of his employment with MSU while he was working at USAG and Twistars and also while he was working with athletes from those institutions.

111.   Defendant Twistars is a gymnastics facility with which Defendant Nassar affiliated from its inception in or around 1996.

112.   Defendant John Geddert ("Defendant Geddert"), owner and operator of Twistars USA, Inc. d/b/a Gedderts' Twistars Gymnastics Club USA served as the USA World and Olympic Women's Gymnastics Team Head Coach.

113.   Defendant Geddert regularly recommended Defendant Nassar to members of Defendant Twistars as a reputable physician.

114.   For a period of time, Defendant Twistars displayed a photo of Defendant Nassar at its facility.

115.   As an agent of Defendant Twistars, Defendant Nassar regularly provided services and treatment to Defendant Twistars' members and Defendant USAG's members on Defendant Twistars' premises.

116.   Defendant Nassar received a benefit from his relationship with Defendant Twistars in the form of national and global exposure, fame, and increased patients at his office at MSU.

117.   Defendant Twistars received a benefit from its relationship with Defendant Nassar in the form of medical services rendered to its member athletes, national and global exposure,

fame, and increased enrollment.

118.   As a physician of Osteopathic Medicine, Defendant Nassar's medical care and treatment should have consisted largely of osteopathic adjustments and kinesiology treatment to patients, including students and student-athletes of Defendant MSU.

119.   Defendant Nassar is not and has never been a medical doctor of obstetrics or gynecology.

120.   While employed by Defendants MSU and USAG, Defendant Nassar practiced medicine at Defendant MSU's Sports Medicine Clinic, a facility at MSU.

121.   For over 20 years, Defendant MSU's Sports Medicine Clinic has provided health care to MSU student athletes and the general public.[9]

122.   When the MSU Defendants operated the MSU Sports Medicine Clinic and provided medical services to Plaintiff and others, they were acting as an arm of the state.

123.   The MSU Sports Medicine Clinic charged patients, including Plaintiff, for their receipt of medical services.

124.   Charging Plaintiff (and others) and billing insurance companies for medical services is an activity proprietary in nature.

125.   The MSU Defendants charged fees comparable to specialists for the services provided at the MSU Sports Medicine Clinic.[10]

126.   The MSU Sports Medicine Clinic engaged in proprietary functions by entering into the business of providing medical services for the primary purpose of raising funds and making a profit for the MSU Defendants.

127.   The MSU Sports Medicine Clinic cannot be normally supported by taxes and fees.

---

[9] *See* "MSU Sports Medicine," http://sportsmed.msu.edu/, last accessed Feb. 22, 2018.

[10] *See* "MSU Sports Medicine," http://sportsmed.msu.edu/patients.html, last accessed Feb. 22, 2018.

128.   During his employment, agency, and representation with the MSU Defendants, Defendant USAG, and Defendant Twistars, Defendant Nassar sexually assaulted, abused, and molested Plaintiff by engaging in nonconsensual sexual touching, assault, and harassment including but not limited to digital vaginal and anal penetration and rape.

129.   The State of Michigan's Department of Licensing and Regulatory Affairs Occupational Health Standards regarding Bloodborne Infectious Diseases mandates use of gloves when exposed to potentially infectious material, including vaginal secretions.[11]

130.   Upon information and belief, in or around 1998 a parent of a gymnast at Defendant Twistars' facility complained to Defendant Geddert regarding Defendant Nassar's conduct, yet the concerns and allegations went unaddressed.

131.   In 1997 or 1998, Larisa Boyce, who was a minor at the time, told MSU gymnastics head coach Kathie Klages about concerns the participant had with Nassar's "treatment." Defendant Klages convinced the participant not to file a formal complaint because Klages intimidated the participant by stating there would be serious consequences to her (the participant) and Nassar.

132.   As a result of Klages being informed about Nassar's conduct, another athlete was asked by Klages if Nassar had performed the "procedure" involving digital vaginal and anal penetration on her, and the athlete responded in the affirmative. Klages told the athlete that there is no reason to bring up Nassar's conduct.

133.   Also in or around 1998, another athlete complained to a coach at Twistars's facility regarding Defendant Nassar's conduct, yet the concerns and allegations went unaddressed.

---

[11]   *See*, Michigan Administrative Code, R. 325.70001, et seq., *available at* http://www.michigan.gov/documents/CIS_WSH_part554_35632_7.pdf. Last accessed, January 5, 2017.

134. In or around 1999 the MSU Defendants were also put on notice of Defendant Nassar's conduct by a MSU student and track and cross-country athlete, Christie Achenbach, after she complained to MSU employees, including trainers and her head coach, Kelli Bert, that Defendant Nassar touched her vaginal area although she was seeking treatment for an injured hamstring.

135. Despite her complaints to MSU representatives, Achenbach's concerns and allegations went unaddressed.

136. In approximately 2000, a female student athlete and member of Defendant MSU's Women's Softball Team, Tiffany Thomas Lopez, was sexually assaulted and abused during "treatment" by Defendant Nassar and reported Defendant Nassar's conduct to Defendant MSU's employees, including trainers.

137. Ms. Lopez's allegations regarding the sexual assault include the following statements:

Plaintiff is informed and believes, and on that basis, alleges, that Defendants knew or should have known that NASSAR had engaged in unlawful sexually-related conduct in the past, and/or was continuing to engage in such conduct. Defendants had a duty to disclose these facts to Plaintiff, her parents and others, but negligently and/or intentionally suppressed, concealed or failed to disclose this information. The duty to disclose this information arose by the special, trusting, confidential, fiduciary relationship between Defendants and Plaintiff. Specifically, the Defendant MSU knew that NASSAR was performing intravaginal adjustments with his bare, ungloved hand and in isolation with young females, based on the following:

a. The Plaintiff, approximately 18 years old at the time, had a visit with NASSAR where he touched her vagina, in order to purportedly heal back pain, she was having, under the guise of legitimate medical treatment. The Plaintiff complained to a trainer on her softball team who responded by saying that NASSAR was a world-renowned doctor, and that it was legitimate medical treatment. The Plaintiff continued with the purported treatment;

b. As the purported treatments continued, NASSAR became bolder, having the Plaintiff remove her pants, and then inserting his bare, ungloved and unlubricated hand into her vagina. The Plaintiff, again, reported to

Defendant MSU training staff, this time a higher-ranking trainer. This trainer told the Plaintiff that the treatment sounded unusual and that the Plaintiff needed to speak to an even higher-level trainer in the Department, who ended up being one of three individuals who supervised the entire department at Defendant MSU;

c.   When the Plaintiff went to see this individual, the Plaintiff was told by that individual that what happened to the Plaintiff was not sexual abuse, that NASSAR was a world-renowned doctor, and that the Plaintiff was not to discuss what happened with NASSAR and was to continue seeing him for purported treatment. The Plaintiff continued to see NASSAR for treatment;

d.   Finally, in or around 2001, the Plaintiff refused to continue to see NASSAR for these abusive and invasive procedures. Defendant MSU then pressured and coerced the Plaintiff to declare herself medically inactive. The Plaintiff was shunned from the Defendant MSU sports program, and left Defendant MSU to return home to California.[12]

138.   One of the trainers that Ms. Lopez reported to was Lianna Hadden, who is still presently employed by MSU as an athletic trainer with the volleyball team.

139.   After reporting the assault to Ms. Hadden, Ms. Lopez also reported the assault to Defendant Teachnor-Hauk.

140.   Ms. Lopez told Defendant Teachnor-Hauk that she was "extremely uncomfortable," but Defendant Teachnor-Hauk told Ms. Thomas Lopez that Nassar was engaged in actual medical treatment.

141.   Defendant Teachnor-Hauk further dissuaded Ms. Lopez from reporting Nassar's conduct further by telling Ms. Lopez that if she pursued the matter further that it would cast a burden over her family and cause Ms. Lopez a lot of heartache and trauma.

142.   Defendant Teachnor-Hauk also defended Nassar by stating to Ms. Lopez by asking why she would want to drag Nassar through an allegation of sexual assault.

---

[12] *See*, Case No. BC644417, filed with the Superior California Court of the State of California, County of Los Angeles, December 21, 2016, ¶26.

143. Despite her complaints to MSU employees, agents, and representatives, Ms. Lopez's concerns and allegations went unaddressed in violation of reporting policies and procedures and Title IX and in a manner that was reckless, deliberately indifferent, and grossly negligent.

144. In approximately 2001 or 2002, Jennifer Rood Bedford, an MSU student athlete on the women's volleyball team, was sexually assaulted and abused during "treatment" by Defendant Nassar and reported Defendant Nassar's conduct to Defendant MSU's employees, including trainers.[13]

145. According to Ms. Bedford, Nassar was known among the women's volleyball team as the "crotch doc" because of his "unconventional methods" of treating sports injuries with vaginal penetrations.

146. Ms. Bedford was extremely uncomfortable with the fact that she had been assaulted and reported the incident to MSU athletic trainer Lianna Hadden.

147. Ms. Hadden dissuaded Ms. Bedford from filing a formal complaint against Nassar because it would result in an investigation against Nassar, making an accusation against Nassar and statement that she felt that what Nassar did was unprofessional or criminally wrong.

148. Upon information and belief, in approximately 2004, Defendant Gary E. Stollak was told by Kyle Stephens—then 11 or 12 years old—that she had been abused by Defendant Nassar.

149. Defendant Stollak did not report the abuse to law enforcement or to child protective services.

---

[13] *See* Nassar Victim: Jennifer Rood Bedford Statement, Jan. 16, 2018, Available at https://www.clickondetroit.com/video/nassar-victim-jennifer-rood-bedford-statement. Last accessed January 16, 2018.

150.   Instead, Defendant Stollak suggested that Ms. Stephens and her parents meet with Nassar.

151.   Ms. Stephens refused to attend the meeting, but her parents met with Defendant Stollak and Defendant Nassar.

152.   Defendant Stollak's failure to report Defendant Nassar endangered dozens, if not hundreds, of Plaintiff who were subsequently sexually abused, assaulted, and molested by Defendant Nassar.

153.   Because MSU took no action to investigate the 1997 or 1998, 1999, 2000, and 2001 or 2002, and 2004 complaints and took no corrective action, from at least 1997 to 2016, under the guise of treatment, the other Plaintiffs, many of whom were minors, were also sexually assaulted, abused, and molested by Defendant Nassar by vaginal and anal digital penetration, without the use of gloves or lubricant and by touching and groping their breasts.

154.   In 2004, Defendant Nassar authored a chapter in Principles of Manual Sports Medicine by Steven J. Karageanes.

155.   In the chapter, Defendant Nassar described the pelvic diaphragm, coccyx, and sacroiliac ligaments as an area of the body not fully examined due to its proximity to the genitalia and buttocks, and stated it was "referred to as the 'no fly zone' because of the many cultural stigmas in touching this area."

156.   Defendant Nassar recommended taking "special measures to explain any examination and techniques applied in this region," and "warning in advance of what you are planning to do," among other suggestions.

157.   There is no mention of intravaginal or intra-rectal techniques or procedures in the chapter.

158.   As described in detail below, Defendant Nassar often failed to follow his own

recommendations with Plaintiff as:

    a.  He did not explain any intravaginal or intra-rectal techniques to Plaintiff or her parents; and,

    b.  He did not warn Plaintiff he was going to engage in vaginal or anal digital penetration before doing so.

159.    Also in 2004, Brianne Randall-Gay reported Defendant Nassar's conduct to her parents and to the Meridian Township Police Department in Meridian Township, Michigan.

160.    In 2014, following receipt of an unrelated complaint regarding a sexual assault on Defendant MSU's campus, between 2014 and 2015 the U.S. Department of Education's Office of Civil Rights (hereinafter "OCR") conducted an investigation regarding the complainant's allegations, another complaint regarding sexual assault and retaliation from 2011, and Defendant MSU's response to said complaints, and their general policies, practices, and customs pertaining to their responsibilities under Title IX.[14]

161.    The OCR concluded their investigation in 2015 and presented Defendant MSU with a twenty-one-page agreement containing measures and requirements to resolve the 2011 and 2014 complaints and to bring Defendant MSU in compliance with Title IX.[15]

162.    While the OCR was conducting their investigation, additional complaints regarding Defendant Nassar's conduct surfaced in 2014. Amanda Thomashow reported she had an appointment with Defendant Nassar to address hip pain and was sexually abused and

---

[14] *See,* Letter from U.S. Department of Education Office for Civil Rights to Michigan State University, September 1, 2015, OCR Docket #15-11-2098, #15-14-2113. Available at https://www2.ed.gov/documents/press-releases/michigan-state-letter.pdf, last accessed January 4, 2017.

[15] *See*, Resolution Agreement, August 28, 2015, OCR Document #15-11-2098, #15-14-2133. Available at, https://www2.ed.gov/documents/press-releases/michigan-state-agreement.pdf. Last accessed January 5, 2017.

molested by Defendant Nassar when he cupped her buttocks, massaged her breast and vaginal area, and he became sexually aroused.[16]

163. Upon information and belief, Defendant MSU investigated the 2014 complaints through their Office of Institutional Equity.

164. However, Amanda Thomashow reported to Defendant MSU facts which were omitted or withheld from the investigative report including but not limited to the following:

    a. Defendant Nassar was sexually aroused while touching her;

    b. The appointment with Defendant Nassar did not end until Amanda Thomashow physically removed his hands from her body.

165. Three months after initiating the investigation, in July 2014, Amanda Thomashow's complaints were dismissed and Defendant MSU determined she didn't understand the "nuanced difference" between sexual assault and an appropriate medical procedure and deemed Defendant Nassar's conduct "medically appropriate" and "[n]ot of a sexual nature."[17]

166. Two of the medical experts consulted by the Office of Institutional Equity in investigating the victim's allegations were Defendants Lemmen and Teachnor-Hauk.

167. Following the investigation, on or about July 30, 2014, Defendant Strampel sent an e-mail to Defendant Nassar that provided new institutional guidelines and restrictions that Defendant Nassar was subject to including:

    a. Defendant Nassar was not to examine or treat patients alone but was to be accompanied by a chaperone such as a resident or nurse; [18]

---

[16] *See*, At MSU: Assault, harassment and secrecy. Matt Mencarini, December 15, 2016. Available at, http://www.lansingstatejournal.com/story/news/local/2016/12/15/michigan-state-sexual-assault- harassment-larry-nassar/94993582/. Last accessed January 5, 2017.

[17] *Id.*

[18] *Id.*

    b.    The alleged "procedure" was to altered to ensure there would be little to no skin to skin contact when in certain "regions" and if skin to skin contact was "absolutely necessary" the "procedure" was to be explained in detail with another person in the room for both the explanation and the "procedure;" and,

    c.    New people in the practice were to be "oriented" to ensure understanding with the guidelines.

168.    Defendant Strampel sent a copy of the July 30, 2014 e-mail that outlined Defendant Nassar's restrictions and guidelines to Defendant Dietzel.

169.    At all relevant times, Defendant Dietzel, Defendant Strampel, and Defendant Kovan were acting in a supervisory role to Defendant Nassar.

170.    The MSU Defendants failed to take any actions to enforce or ensure that Defendant Nassar was in compliance with the restrictions outlined by Defendant Strampel in his July 30, 2014 e-mail to Defendant Nassar.

171.    Upon information and belief, the MSU Defendants failed to take any action to orient new MSU employees to ensure that they were aware of the restrictions placed on Nassar.

172.    In approximately March 2016, Diane Rork was an employee of MSU serving as a registered medical assistant.[19]

173.    Through her employment with MSU, Diane Rork had occasion to work with patients who were to be seen by Defendant Nassar.

174.    At no point in time was Diane Rork ever told of any restrictions or guidelines regarding Defendant Nassar's treatment of patients.

175.    On one occasion in March 2016, Diane Rork was completing a chart of a girl younger than

---

[19] *See,* Kim Kozlowski, *Witness: MSU Knew Nassar Asked Her to Leave Girl's Exam*, Kim Kozlowski, Detroit News (Dec. 21, 2017), http://www.detroitnews.com/story/news/michigan/2017/12/21/msu-nassar-scandal-witness-claims-retribution/108800992/

13 who was set to be examined by Defendant Nassar in an exam room at Defendant MSU's Sports Medicine Clinic.

176. Defendant Nassar ordered Diane Rork to leave the room so that he could "treat" the young girl alone.

177. Diane Rork reported her March 2016 interaction with Defendant Nassar to the MSU Police Department in January 2017.

178. MSU terminated Diane Rork's employment approximately two weeks later.

179. In addition, an unnamed registered nurse employed by MSU at the MSU Sports Medicine from approximately 2015 to 2016, has indicated that she was never made aware of any restrictions or guidelines concerning Defendant Nassar.

180. This unnamed registered nurse was the only registered nurse employed by Defendant MSU's Sports Medicine Clinic during the time of her employment.

181. From July 2014 to September 2016, despite complaints about Defendant Nassar's conduct and an open criminal investigation into Defendant Nassar's conduct, Defendant MSU continued to permit Defendant Nassar unfettered access to female athletes without adequate oversight or supervision to ensure he was complying with the new guidelines.

182. In a March 14, 2017 interview with Michigan State University Police Department Detective Sergeant Christopher Rozman, Defendant Strampel admitted that the institutional restrictions and guidelines that Defendant Nassar was subject to were illusory in nature because he only shared them with Defendant Dietzel and took no action whatsoever to ensure that the institutional restrictions and guidelines were implemented, followed, or enforced.

183. Defendant Strampel also told Detective Sergeant Rozman that he did not want any other

employees in the Sports Medicine Clinic to know that Defendant Nassar had been accused of sexual assault or that Nassar was subject to institutional restrictions or guidelines.

184. Defendant Strampel also admitted to Detective Sergeant Rozman that he did not take any steps to orient any new employees at Defendant MSU's Sports Medicine Clinic to the institutional restrictions or guidelines that Defendant Nassar was purportedly subject to until after Defendant Nassar's termination.

185. In a March 15, 2017 interview with Michigan State University Police Department Detective Lieutenant Andrea Munford, Michigan State University Police Department Detective Sergeant Christopher Rozman, and Federal Bureau of Investigation Special Agent Rodney Charles, Defendant Teachnor-Hauk stated that she had never had an athlete tell her that Defendant Nassar had made them uncomfortable or that Defendant Nassar had performed digital vaginal penetration.

186. Defendant Teachnor-Hauk's March 15, 2017 statements to law enforcement were false for the reason that numerous athletes had previously reported concerns of uncomfortable and inappropriate treatment by Defendant Nassar to her, including complaints of digital vaginal penetration by Defendant Nassar under the guise of medical treatment.

187. Plaintiff was made aware of Defendant Nassar's widespread sexual abuse on or around September 12, 2016 or sometime thereafter through related media coverage.[20]

188. Others have been made aware of the allegations of Defendant Nassar's conduct more recently through related media coverage.

189. Defendant Nassar's employment ended with Defendant MSU on approximately September 20, 2016 only after the MSU Defendants became aware that:

[20] *Id.*

33

   a. Defendants Nassar and USAG were sued by a former Olympian who alleged she was sexually assaulted by Defendant Nassar;[21] and,

   b. A former patient of Defendant Nassar, Rachel Denhollander, filed a criminal complaint with the Michigan State University Police Department alleging Defendant Nassar sexually assaulted her when she was 15 years old and seeking treatment for back pain as a result of gymnastics. Ms. Denhollander's allegations of sexual assault by Defendant Nassar included but were not limited to:

      i. Massaging her genitals;

      ii. Penetrating her vagina and anus with his finger and thumb; and,

      iii. Unhooking her bra and massaging her breasts.[22]

190. Reasons given to Defendant Nassar for his termination included but were not limited to:

   a. Deviation from "required best practices put in place following the internal sexual harassment investigation conducted … in 2014;"

   b. Failure to disclose a 2004 complaint to Meridian Township Police; and,

   c. Dishonesty by Defendant Nassar when Defendant MSU questioned him about receiving prior complaints about the "procedure" at issue.

191. Shortly after MSU terminated Defendant Nassar's employment, Defendant Klages requested the MSU Women's Gymnastics Team members to sign a card for the team to show their support for Defendant Nassar—despite the fact that Defendant Klages was aware that Defendant Nassar's employment had been terminated due to numerous claims of sexual assault against patients and athletes.[23]

---

[21] *See*, Case No. 34-2016-00200075, filed with the Superior Court of the State of California, County of Sacramento, September 8, 2016. A copy of the Complaint is available at https://www.documentcloud.org/ documents/3106054-JANE-JD-COMPLAINT-Signed.html. Last accessed January 5, 2017.

[22] *See*, Former USA Gymnastics doctor accused of abuse, Mark Alesia, Marisa Kwiatkowski, Tim Evans, September 12, 2016. Available at, http://www.indystar.com/story/news/2016/09/12/former-usa-gymnastics-doctor-accused-abuse/89995734/. Last accessed January 5, 2017.

[23] *See*, MSU Abuse Scandal: Coach Had Gymnasts Sign Card for Dr. Larry Nassar, Stephanie Gosk, Kristen Powers, and Tracy Connor, March 21, 2017. Available at,

192. Defendant Klages also passionately defended Defendant Nassar to the MSU Women's Gymnastics Team and told her athletes that she would trust her own grandkids with him— despite the numerous allegations of sexual assault against Defendant Nassar and the existence of open criminal investigations into his conduct.

193. In September 2016, following MSU's termination of Defendant Nassar's employment, MSU Athletic Department's Director of Athletic Communications, Jamie Weir Baldwin, instructed members of the MSU Women's Gymnastics Team not to speak to the media or post on their social media accounts regarding Defendant Nassar's actions.

194. Based on the communications of the MSU Athletic Department, members of the MSU Women's Gymnastics Team believed that they would be punished by MSU or face negative consequences if they came forward to the police or media to describe sexual assaults against them.

195. In December 2016, following the filing of federal child pornography charges against Defendant Nassar, Defendant Klages continued to defend Defendant Nassar and told the parent of one of Defendant Nassar's victims that the child pornography "could have been planted" by somebody suing Defendant Nassar and also continued to deny that Defendant Nassar had sexually assaulted any patients by suggesting that the victims had "misinterpreted the treatment."

196. MSU did not directly encourage the members of the MSU Women's Gymnastics Team to report suspected abuse by Defendant Nassar to the police until February 2017— approximately 5 months after MSU terminated Defendant Nassar's employment.

---

https://www.nbcnews.com/news/us-news/msu-abuse-scandal-coach-had-gymnasts-sign-card-dr-larry-n731781. Last accessed December 27, 2017.

197.   After receiving allegations of "athlete concerns," in approximately summer 2015 Defendant USAG relieved Defendant Nassar of his duties.[24]

198.   At no time did Defendant USAG inform Defendants MSU, MSU Trustees, or other MSU representatives of the concerns that led to Defendant Nassar being relieved from his duties with Defendant USAG.

199.   At no time did Defendant USAG inform Defendants Twistars or Geddert of the concerns that led to Defendant Nassar being relieved from his duties with Defendant USAG— despite the fact that Defendant Twistars is a USAG member club and Defendant Geddert is a USAG member coach.

200.   In approximately December 2016, Defendant USAG settled one or more claims against it involving allegations of sexual abuse by Defendant Nassar against Olympic gold-medal-winning gymnast McKayla Maroney pursuant to a confidential settlement agreement in California.

201.   Upon information and belief, USAG entered into one or more confidential settlement agreements in California involving claims of child sex abuse or other acts that could be prosecuted as a felony sex offense by Defendant Nassar.

202.   Notably, California law prohibits confidential settlements in cases involving allegations of child sexual abuse or an act that could be prosecuted as a felony sex offense. CAL. CIV. PROC. CODE § 1002.

203.   Upon information and belief, USAG's settlement agreement with McKayla Maroney is not the first or the only settlement agreement that USAG has entered into to resolve civil claims

---

[24] *See*, Former USA Gymnastics doctor accused of abuse, Mark Alesia, Marisa Kwiatkowski, Tim Evans, September 12, 2016. Available at, http://www.indystar.com/story/news/2016/09/12/former-usa-gymnastics-doctor-accused-abuse/89995734/. Last accessed January 5, 2017.

of victims of sexual abuse by Defendant Nassar against USAG.

204. In late November 2016, Defendant Nassar was arrested and charged in Ingham County, Michigan on three charges of first-degree criminal sexual conduct with a person under 13, and was later released on $1 million bond.[25]

205. In mid-December 2016, Defendant Nassar was indicted, arrested, and charged in Federal Court in Grand Rapids, Michigan on charges of possession of child pornography and receipt/attempted receipt of child pornography.

206. According to the federal indictment,[26] Defendant Nassar:

    a. Knowingly received and attempted to receive child pornography between approximately September 18, 2004 and December 1, 2004;

    b. Knowingly possessed thousands of images of child pornography between approximately February 6, 2003 and September 20, 2016 including images involving a minor who had not attained 12 years of age.

207. Testimony given by an FBI agent at a hearing held on December 21, 2016, alleged, among other allegations, that Defendant Nassar used a GoPro camera to record video images of children in a swimming pool and that:

    a. Defendant Nassar's hand can be seen grabbing one girl's hand and shoving it into the vaginal area of another girl; and,[27]

    b. Defendant Nassar's thumb can be seen pressing into a child's vagina/vaginal area.[28]

208. In mid-January 2017, Defendant Brooke Lemmen, D.O. submitted a letter of resignation to Defendant Strampel amid allegations that she:

    a. Removed several boxes of confidential treatment patient records from Defendant MSU's Sports Medicine clinic at Defendant Nassar's request;

---

[25] State of Michigan, Ingham County Circuit Court Case No. 17-143-FC.
[26] 1:16-cr-00242 PageID.1-4.
[27] *Id*. at PageID.49-50.
[28] *Id*. at PageID.50.

     b.   Did not disclose to Defendant MSU that Defendant USAG was investigating Defendant Nassar as of July 2015; and,

     c.   Made a staff member feel pressured not to fully cooperate in an internal investigation into allegations against Defendant Nassar.

209.   On February 7, 2017, a superseding indictment added an additional count of "Destruction and Concealment of Records and Tangible Objects" alleging between September 19, 2016 and September 20, 2016, Defendant Nassar "caused a third-party vendor to permanently delete and destroy all images, records, documents, and files contained on the hard drive of a laptop computer, and the defendant threw in the trash a number of external hard drives."[29]

210.   On February 17, 2017, following a preliminary examination, Defendant Nassar was ordered to stand trial on three charges of first-degree criminal sexual conduct with a person under 13 in Ingham County, Michigan following testimony which included, among others, allegations of digital vaginal penetration at Defendant Nassar's residence.

211.   On February 22, 2017, Defendant Nassar was arraigned on 22 counts of first-degree criminal sexual conduct with a person under 13 years old, and 14 counts of third-degree criminal sexual conduct with a person under the age of 13 years old in Ingham County, Michigan[30] and Eaton County, Michigan.[31]

212.   Defendant Nassar's preliminary examinations on the second set of charges in Ingham County was held on May 12, 2017, May 26, 2017, and June 23, 2017.

213.   During Nassar's preliminary examination on May 12, 2017 in the 55th District Court in

---

[29] *Id*. at PageID.88.

[30] *State v. Nassar*, Ingham County District Court Case No. 17-00425, *see also*, http://www.michigan.gov/documents/ag/Nassar_affidavit_Ingham_County_charges_Feb._2017_552531_7.pdf

[31] *State v. Nassar*, Eaton County District Court Case No. 17-0318, *see also,* http://www.michigan.gov/documents/ag/Nassar_affidavit_Eaton_County_charges_Feb._2017_552536_7.pdf

Ingham County, Michigan, a young woman testified regarding an instance of sexual assault that occurred at Twistars's facility in Dimondale, Michigan in approximately 2010 when she was fifteen years old as follows, "Mostly all I remember is [Nassar] doing the treatment on me with his fingers in my vagina, massaging my back with a towel over my butt, and John [Geddert] walking in and making a joke that I guess my back really did hurt, and then I was uncomfortable because John [Geddert] was in there during that."

214. At the conclusion of the preliminary examination, Defendant Nassar was ordered to stand trial on 12 counts of first-degree criminal sexual conduct following testimony by Rachael Denhollander and others, which included, among others, allegations of digital vaginal and anal penetration by Defendant Nassar.

215. Defendant Nassar's preliminary examination on the charges issued in Eaton County, Michigan was held on June 30, 2017.

216. At the conclusion of the preliminary examination, Defendant Nassar was ordered to stand trial on 7 counts of first-degree criminal sexual conduct following testimony, which included among others, allegations of digital vaginal penetration by Defendant Nassar.

217. As of the filing of this Second Amended Complaint, Nassar faced a total of 22 counts of first-degree criminal sexual conduct in circuit court—15 in Ingham County, Michigan and 7 in Eaton County, Michigan.

218. On or about July 11, 2017, Defendant Nassar pled guilty in his federal criminal case to: (1) Receipt and Attempted Receipt of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A); (2) Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B); and (3) Destruction and Concealment of Records and Tangible Objects, in violation of 18 U.S.C. § 1519.

219.   On November 11, 2017 Defendant Nassar pleaded guilty to seven counts of first-degree criminal sexual conduct in Ingham County Circuit Court.

220.   On November 29, 2017 Defendant Nassar pleaded guilty to three counts of first-degree criminal sexual conduct in Eaton County Circuit Court.

221.   On December 7, 2017 Defendant Nassar was sentenced in the United States District Court for the Western District of Michigan by District Court Judge Janet T. Neff to three twenty-year sentences to be served consecutively on his convictions for (1) Receipt and Attempted Receipt of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A); (2) Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B); and (3) Destruction and Concealment of Records and Tangible Objects, in violation of 18 U.S.C. § 1519.

222.   Defendant Nassar's sentencing hearing on his convictions for seven counts of first-degree criminal sexual conduct in Ingham County Circuit Court took place from January 16, 2018 to January 24, 2018.

223.   Defendant Nassar's sentencing on his convictions for three counts of first-degree criminal sexual conduct in Eaton County Circuit Court took place from January 31, 2018 to February 5, 2018.

224.   Between the sentencing hearings in Ingham and Eaton Counties, approximately 204 victim impact statements given over 9 days.

225.   The Plaintiff in this action gave impact statements, and Plaintiffs who were initially seeking to proceed pseudonymously in this action chose to publicly identify themselves at the sentencing hearings.

226.   On January 24, 2018, Defendant Nassar was sentenced in Ingham County Circuit Court to serve 40 to 175 years in the Michigan Department of Corrections.

227. On February 5, 2018, Defendant Nassar was sentenced in Eaton County Circuit Court to serve 40 to 125 years in the Michigan Department of Corrections.

228. During and in the wake of the sentencing hearings:

    a.    Ms. Simon resigned as President of Defendant MSU on January 24, 2018;

    b.    Mr. Hollis resigned as Athletic Director of Defendant MSU on January 26, 2018;

    c.    By January 31, 2018, the entire board of directors of Defendant USAG resigned under threat of decertification by the U.S. Olympic Committee;

    d.    Steps to revoke Defendant Strampel's tenure and terminate his employment with Defendant MSU were initiated on or around February 9, 2018, with Defendant MSU stating publicly, ". . . Strampel did not act with the level of professionalism we expect from individuals who hold senior leadership positions, particularly in a position that involves student and patient safety . . . . Further allegations have arisen that question whether his personal conduct over a long period of time met MSU's standards."[32]

## V. SPECIFIC FACTUAL ALLEGATIONS

### A. ERIKA DAVIS

229. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

230. In 1992 Plaintiff Erika Davis was a vibrant 17-year-old elite field hockey player who had received an NCAA scholarship to play at MSU.

---

[32] See, Engler Takes First step to Remove Strampel, February 8, 2018, available at http://msutoday.msu.edu/news/2018/engler-takes-first-step-to-remove-strampel/. Last accessed Feb. 17, 2018.

231.   Plaintiff Erika was injured in 1992 during her spring quarter practice when she planted too hard on the turf and twisted her knee. Her knee began popping a lot and caused her a lot of pain and discomfort.

232.   Plaintiff Erika Davis's injury is not uncommon in field hockey.

233.   Plaintiff Erika's field hockey Coach, Martha Ludwig, recommended she make an appointment with Defendant Nassar for her knee pain. Plaintiff Erika's Coach knew Defendant Nassar through a mutual friend and also told Plaintiff Erika that Defendant Nassar was conducting a study and needed athlete participants.

234.   On her coach's recommendation, and on the reputation of Defendant Nassar, Plaintiff Erika made an appointment to see Defendant Nassar on a Friday in the Spring of 1992.

235.   Defendant Nassar was a renowned orthopedic sports medicine physician, well respected in the gymnastics community and the team doctor of the United States Gymnastics team.

236.   Defendant Nassar was promoted as the team doctor and received patients because of his status as team doctor.

237.   Plaintiff Erika had no reason to suspect Defendant Nassar was anything but a competent, respectable physician.

238.   Plaintiff Erika saw Defendant Nassar for the first time, on or about, early 1992.

239.   Beginning with Plaintiff Erika's first visit Defendant Nassar began to "groom" Plaintiff Erika.

240.   Defendant Nassar diagnosed Plaintiff Erika's knee pain and agreed to treat her.

241.   Defendant Nassar did not discuss what his "treatments" would be with Plaintiff Erika.

242. During the course of Defendant Nassar's first meeting with Plaintiff Erika he asked her a variety of questions including, but not limited to, whether her father was around, whether she had ever done gymnastics, and whether she had ever had a vaginal exam.

243. Defendant Nassar asked Plaintiff Erika about her future career aspirations, and she responded that she wanted to be a doctor to cure cancer, after her mother had recently passed from breast cancer.

244. Defendant Nassar told Plaintiff Erika that he was doing a flexibility study through the College of Osteopathic Medicine. He had a cameraman at the meeting. Plaintiff Erika asked how many people were in the study and Defendant Nassar told her that she would be the third participant in the study. However, to consent she had to be 18 years old or older. Since she was only 17, Defendant Nassar indicated her Coach could consent for her.

245. Defendant Nassar further inquired whether Plaintiff Erika had ever had a breast examination, and she had not. Defendant Nassar asked her to remove her shirt and bra, which she did. Defendant Nassar then told her that she had prepubescent breasts, but that he thought he could get the nipples hard. He then used his hands and then his mouth to do so. During this time, the cameraman was filming Defendant Nassar's sexual abuse of Plaintiff Erika. Defendant Nassar then asked the cameraman to step outside for a discussion.

246. When he returned, Defendant Nassar then asked Plaintiff Erika to come back for a full female exam in approximately one week, which she did.

247. At this appointment, Defendant Nassar crushed up a pill and made Plaintiff Erika drink it. He would not tell her what he was giving her, but she was told and trusted that it was part of the treatment for her knee.

248.   Defendant Nassar used a camera to record the appointment.

249.   However, soon thereafter, Plaintiff Erika got so tired and could not move her arms. Eventually, she could not keep her eyelids open and got very woozy.

250.   When she was less woozy a short time later, Plaintiff Erika witnessed Defendant Nassar raping her.

251.   Plaintiff Erika was a virgin at that time.

252.   She was still unable to move and looked at the clock, realizing that she had been knocked out for more than an hour.  Plaintiff Erika, still in a daze, felt Defendant Nassar speed up his penetrations and then grunt, ejaculating into her.

253.   Defendant Nassar then got dressed, put his penis away and told her that he would see her again in two months.

254.   Plaintiff Erika had a difficult time getting up and leaving the office, but when she did, she had tremendous pain originating from her vagina.

255.   For the rest of the day, Plaintiff Erika had Defendant Nassar's semen dripping from her vagina into her underwear.  She repeatedly went to the bathroom to clean it up.

256.   Plaintiff Erika went to dinner with two of her friends.  She eventually told these friends what happened to her, and they agreed to go to with her to the police when she was ready to do so.

257.   Plaintiff Erika told her coach what happened, and her coach confronted Defendant Nassar in May of 1992.

258.   The coach went to Defendant Nassar's office, demanded and received the video of Plaintiff Erika's appointment with Defendant Nassar.

259. The coach then complained about what Defendant Nassar did to Plaintiff Erika to the current Athletic Director at Defendant Michigan State University.

260. George Perles, former Athletic Director at Defendant Michigan State University intervened and the charges were dropped against the coach, but she was forced to return the video, resign and sign a non-disclosure agreement. Upon information and belief, Coach Martha made and retained a copy of the videotape.

261. This proves that not only did Defendant Michigan State University have knowledge that Defendant Nassar sexually abused and sexually assaulted minors, but that it would also go to great lengths to conceal this conduct.

262. Defendant Michigan State University could have stopped Defendant Nassar's conduct back in 1992, but did not.

263. Defendant Michigan State University could have prevented hundreds of young girls and women from being sexually assaulted by Defendant Nassar had they only acted appropriately, decently and lawfully in 1992.

264. Later in the Summer, Plaintiff Erika had not menstruated and informed her "dorm mom" Cheryl. They took a pregnancy test and Plaintiff Erika's came back positive. The only person who could have caused her to be pregnant was Defendant Nassar. Cheryl told Plaintiff Erika that she had been raped and should report what happened to the police.

265. A few weeks later, Plaintiff Erika had tremendous abdominal, pelvic and back pain, and profuse bleeding. She had miscarried.

266. Thereafter, Plaintiff Erika was ready to go to the police and she did so with her two friends, Teresa and James.

267. In October of 1992, Plaintiff Erika and her friends went to the Michigan State University police department and reported the rape. The police told them that since she was an athlete, she had to report it to the athletic department. The detective explicitly told them that he was powerless to investigate anything that takes place to the athletic department and to go to the athletic department.

268. Plaintiff Erika explained that the athletic department already dismissed it and the Sergeant responded that George Perles is a "powerful man," and she should just drop it.

269. Plaintiff Erika's friends complained that this was "wrong" and "had to be illegal." The Sergeant told them that his hands were tied and to leave the station.

270. Thereafter, Plaintiff Erika's Field Hockey NCAA scholarship was taken away from her.

271. Plaintiff Erika was young, impressionable and sexually inexperienced. She had never been intimate with a member of the opposite sex.

272. As a young woman, Plaintiff Erika implicitly trusted her doctor.

273. Under the guise of "treatment" Defendant Nassar subjected Plaintiff Erika to inappropriate, nonconsensual sexual touching, abuse, assault, and rape.

274. Defendant Nassar used his position of authority as a medical professional to abuse Plaintiff Erika.

275. Defendant Nassar would always see Plaintiff Erika alone or with a cameraman.

276. Defendant Nassar told Plaintiff Erika that it was necessary to examine her breasts and vagina given her family history of cancer.

277. Defendant Nassar is not a gynecologist.

278. Nonetheless, Defendant Nassar molested, fondled, assaulted, and raped Plaintiff Erika.

279. Defendant Nassar repeatedly told Plaintiff Erika his "treatments" were medically recognized.

280. Defendant Nassar routinely claimed he was releasing tension and relaxing muscles.

281. Defendant Nassar would perform his "treatments" for the entire length of the appointment, occasionally for near an hour.

282. Defendant Nassar would often refer to the inappropriate, nonconsensual sexual touching as a "full treatment."

283. Plaintiff Erika discontinued treating with Defendant Nassar after this incident.

284. Plaintiff Erika did not suspect any sexual assault had occurred and she was told that nothing could be done about it.

285. Defendant Nassar was a well-respected physician, he repeatedly told Plaintiff Erika he was performing a recognized treatment for knee pain. Defendant Nassar never discussed the treatment with Plaintiff Erika and he took careful steps to ensure he was always alone with Plaintiff Erika.

286. Defendant Nassar perpetrated this fraud for over 20 years.

287. As a sexually inexperienced teenager Plaintiff Erika had no reason and no way to know what was happening to her.

288. Plaintiff Erika was pressured by her coach and the athletic department to not report this incident and was told if she reported it that she would lose her field hockey scholarship.

289. Plaintiff Erika could not have known Defendant Nassar was a serial pedophile who carefully selected and groomed his victims.

290. Plaintiff Erika subconsciously carried the effects of Defendant Nassar's abuse throughout her entire life.

291. Plaintiff Erika began to realize what had been done to her when other victims began to come forward and when she saw a video of her being examined by Defendant Nassar on the news. Plaintiff Erika repressed these memories until February of 2018.

292. Plaintiff Erika faced the realization Defendant Nassar had never been performing medical treatments but instead had sexually assaulted her.

293. The veil of fraud and intentional concealment finally lifted and Plaintiff Erika understood exactly what she had been through.

294. Plaintiff Erika was forced to relive the trauma of sexual assault as she came to grips with everything she had experienced.

295. Plaintiff Erika has never been able to live a healthy normal life because of the years of sexual abuse Plaintiff Erika suffered at the hands of Defendant Nassar. Subconsciously Plaintiff Erika has always been affected by the abuse.

296. Plaintiff Erika suffers from anxiety, depression and a host of other issues, including a suicide attempt in 1993 and suicidal ideation at many other times.

297. Plaintiff Erika must face daily pain and suffering as she goes through the process of documenting all the actions of Defendant Nassar. Furthermore, Plaintiff Erika was triggered when Channel 7 News covered the story and showed the training video with her in it.

298. Defendant Nassar and the MSU Defendants profited from the training video which featured Plaintiff Erika.

299. Plaintiff Erika was deprived of a normal childhood and is now being deprived of a normal life, all because of Defendant's conduct.

300. Plaintiff Erika avoided gynecological exams due to the trauma caused by Defendant Nassar. When Plaintiff Erika was finally persuaded to have a gynecological examination, she was told that she had been infected by the HPV virus which caused Plaintiff Erika's cervical cancer.

## VI.     FRAUDULENT CONCEALMENT

## B.    A.    <u>THE MSU DEFENDANTS</u>

301. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

302. Plaintiff sought treatment at Defendant MSU's Sports Medicine Clinic and/or the Athletic Department and/or Department of Osteopathic Medicine and was in a special relationship in which she paid or was billed for medical treatment.

303. Given the special relationship, the MSU defendants had a duty to disclose and to warn and protect the athletes and patients who sought treatment at its facility with its doctor.

304. Plaintiff hereby alleges that the MSU Defendants committed Fraudulent Concealment by committing Fraud, as described in detail above and below, and concealing the existence of Plaintiff's claims and that Plaintiff had a cause of action against Defendant Nassar and/or the MSU Defendants at the time Defendant Nassar's sexual assaults occurred by making material misrepresentation(s) to Plaintiff.

305. Defendant MSU's sports medicine trainers, employees, staff, managers, supervisors, directors, agents, apparent agents, and/or servants made material representation(s) to Plaintiff involving a past or existing fact by making statements that:

a.    Defendant Nassar was an "Olympic doctor" and "knew what he was doing" in regard to performing appropriate "treatments;"

b. Defendant Nassar was a "world-renowned doctor" and that "it was legitimate medical treatment," in regard to the legitimacy and appropriateness of the "treatments;"

c. Defendant Nassar's conduct was "not sexual abuse;" and

d. That Defendant Nassar's conduct and "treatments" were "medically appropriate" and "[n]ot of a sexual nature" because the complainant "didn't understand the 'nuanced difference' between sexual assault and an appropriate medical procedure."

306. The material representation(s) to Plaintiff were false in that the MSU Defendant had previously received strikingly similar complaints of abuse by Defendant Nassar from other students and patients and knew that the appropriateness of his "treatments" had been questioned in the past.

307. When the MSU Defendants made the material misrepresentation(s) to Plaintiff, they knew that they were false and/or they made them recklessly, without any knowledge of their truth and as a positive assertion, because they knew that Defendant MSU had previously received strikingly similar complaints of abuse by Defendant Nassar from other students and patients and knew that the appropriateness of his "treatments" had been questioned in the past.

308. Defendants made the material representation(s) with the intent that the material representation(s) should be acted or relied upon by Plaintiff or her parents, such that Plaintiff:

a. Should believe that the "treatments" were in fact legitimate medical "treatments;"

b. Should believe that the "treatments" were proper, appropriate, and legitimate;

    c.   Should not believe that they had been sexually assaulted;

    d.   Should not believe that they had been sexually assaulted so that he could prevent discovery of his sexual assaults;

    e.   Should continue the "treatments" so that he could continue to sexually assault them;

    f.   Should not question and/or report the conduct to appropriate authorities; and

    g.   Should not reasonably believe and not be aware of a possible cause of action that they have against Defendant Nassar and/or Defendant MSU.

309.    Plaintiff acted in reliance upon the material representation(s), in that Plaintiff:

    a.   Reasonably believed that the "treatments" were in fact "treatments;"

    b.   Reasonably believed that the "treatments" were proper, appropriate, and legitimate;

    c.   Reasonably did not believe that they had been sexually assaulted;

    d.   Believed that they should continue the "treatment[s];"

    e.   Did not believe that they should question and/or report the conduct to appropriate authorities; and,

    f.   Did not reasonably believe that they had and were not aware of a possible cause of action that they had against Defendant Nassar and/or the MSU Defendants.

310.    Plaintiff thereby suffered injury, in that Plaintiff:

    a.   Could not stop the sexual assault;

    b.   Continued to undergo the "treatment[s]" and sexual assaults;

    c.   And suffered pregnancy, miscarriage, discomfort, bleeding, urinary tract infections, bacterial infections, related physical manifestations thereof, sleep deprivation, physical illness, vomiting, severe emotional distress, shock, humiliation, fright, grief, embarrassment, loss of self-esteem, disgrace, loss of familial relationships, loss of enjoyment of life and will continue to suffer pain of mind and body, were prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity, among other injuries more fully described below.

311. The MSU Defendants concealed the fraud by failing to disclose, warn, or protect, or by making a fraudulent material representation(s) to Plaintiff that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he made a material representation(s) to Plaintiff involving a past or existing fact by:

   a. Making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal or anal penetration;

   b. Making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

   c. Making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

   d. Making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

   e. Making the statement, explaining, that his acts and/or conduct was medical "treatment" for a legitimate medical purpose and that it was the same that he performed on Olympic athletes;

   f. Making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

   g. Making the statement that the position of his hand was in an appropriate place—when it was not—while he was digitally penetrating Plaintiff, all of which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

312. Defendants' agents and employees concealed the fraud by affirmative act(s) that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that they:

   a. Ignored, refused, and failed to inquire, question, and investigate the complaints and take action regarding Defendant Nassar's "treatments;"

   b. Did not create a policy to require adults, parents, chaperones, guardians, and/or caregivers presence during an examination of a minor or female patient by a physician; and

52

      c.  Did not enforce the restrictions that had been put into place in 2014 by Defendant MSU restricting Defendant Nassar's examination and treatment of patients.

313.  Plaintiff did not know, could not have reasonably known, and were reasonably unaware of a possible cause of action that they had against Defendant Nassar and/or Defendant MSU until the September 12, 2016 publication of a story regarding a complaint filed with Defendant MSU's Police Department, titled "Former USA Gymnastics doctor accused of Abuse," or sometime thereafter, for the following reasons among others:

      a.  Plaintiff reasonably relied on the Fraud committed by Defendant Nassar by his material representations and concealment of the true nature of his "treatments[s]"and his actions;

      b.  Plaintiff was a minor and/or young female at the time of the assaults and "treatments;"

      c.  Plaintiff did not know what a legitimate and appropriately performed intra-vaginal or intra-anal/rectal treatment was like because she had never experienced and/or had an intra-vaginal or intra-anal/rectal treatment before;

      d.  Plaintiff had never experienced and/or had an intra-vaginal treatment before because she had never been treated by a physician and/or therapist that performed them;

      e.  Plaintiff did not know what a legitimate and appropriately performed pelvic, vaginal, anal, and/or breast exam was like because she had never experienced and/or had a pelvic, vaginal, anal, and/or breast exam before;

      f.  Plaintiff had never experienced and/or had a pelvic and/or vaginal exam before because pelvic and/or vaginal exams are not recommended and routinely performed until a female reaches at least the age of 18 years old, pursuant to longstanding recommendations in the literature, expert opinions, treatment guidelines, and position statement from the American Academy of Pediatrics, American Academy of Family Physicians, American Cancer Society, American College of Obstetricians and Gynecologists, American Society for Clinical Pathology, and American Society for Colposcopy and Cervical Pathology;

g.  Plaintiff had never experienced and/or had a breast exam before because breast exams are not recommended and routinely performed until a female reaches at least the age of 21 years old, pursuant to longstanding recommendations in the literature, expert opinions, treatment guidelines, and position statement from the American Academy of Pediatrics, American Academy of Family Physicians, American Cancer Society, American College of Obstetricians and Gynecologists, American Society for Clinical Pathology;

h.  Because of these recommendations and never having had one of these treatments or exams, it was very difficult if not impossible for Plaintiff to differentiate a legitimate and appropriately performed intra-vaginal treatment, pelvic, vaginal, anal, and/or breast exam from a sexual assault;

i.  Plaintiff could not have possibly known because there were no parents, chaperones, guardians, caregivers, and/or other medical professionals in the room during the "treatments" to observe, question, and/or discover that his "treatments" were sexual assaults and inform Plaintiff that they had been sexually assaulted and had a cause of action against Defendant Nassar;

j.  In the instances where a parent was present in the room, Defendant Nassar's actions to conceal the physical assaults from the view of the parents prevented the parents from discovering that his "treatments" were sexual assaults and informing Plaintiff that they had been sexually assaulted and had a cause of action against Defendant Nassar;

k.  Based on Neuroscience, the prefrontal cortex of the brain, which we use to make decisions and distinguish right from wrong, is not fully formed until around the age of 23;

l.  Based on Neuroscience, as the prefrontal cortex of the brain matures teenagers are able to make better judgments;

m.  Plaintiff was intimidated by Defendant Nassar's notoriety and reputation and therefore believed his misrepresentations that the "treatment[s]" were legitimate and appropriate;

n.  Plaintiff trusted Defendant Nassar due to his notoriety and reputation;

o.  Plaintiff trusted Defendant Nassar because he groomed them to believe that his "treatments" were legitimate;

p.   Plaintiff trusted and felt that Defendant Nassar was a friend because at appointments he gave Plaintiff gifts such as t-shirts, pins, flags, leotards, and other items, some with USAG logos and others without, in order to gain their trust;

q.   Plaintiff had no reason to believe or be aware that she could possibly sue or had a possible cause of action because she was a minor and young female who was not knowledgeable or aware of the civil justice system;

r.   Plaintiff had no reason to believe or be aware that she could possibly sue or had a possible cause of action because she was a minor and young female who was not knowledgeable or aware of any remedy at law;

s.   Plaintiff had no reason to believe or be aware that she could possibly sue or had a possible cause of action evidenced by the fact that so many other girls had been sexually assaulted by Defendant Nassar over the past few decades, none of them had a reason to believe or be aware that they could possibly sue or had a possible cause of action in the past; and none of them have ever sued him in the past;

t.   Plaintiff was never told by Defendant Nassar that his conduct was sexual in nature and not legitimate and appropriate "treatment[s]" and to conceal the sexual conduct from their parents and others, unlike other victims of sexual abuse who are typically told by their perpetrators that their conduct is of a sexual nature and to conceal the sexual conduct from their parents and others;

u.   Plaintiff was compelled by Defendant Nassar to undergo "treatment[s]" like other athletes if they wanted to continue being involved in their relevant sport therefore the "treatments" were legitimate and appropriate;

v.   Plaintiff was a minor and young athlete; therefore, she was easily suggestible;

w.   Plaintiff had never previously heard about any allegations in the media regarding sexual assaults or misconduct by Defendant Nassar;

x.   Plaintiff reasonably and justifiably relied on the Fraud committed by the MSU Defendants by their material misrepresentations and concealment of the true nature of Defendant Nassar's "treatments" and his actions;

y.   Plaintiff trusted that the MSU Defendants would protect Plaintiff from harm and not hire, employ, and/or retain a physician that had, was, or would perform illegitimate and/or inappropriate "treatments," engage in inappropriate conduct, and/or sexually assault patients, students, or athletes;

z.  Plaintiff was never told by the MSU Defendants that Defendant Nassar's conduct and "treatments" were inappropriate and sexual assault—to the contrary Plaintiff was told that Defendant Nassar's conduct and "treatments" were appropriate and legitimate treatments, "not sexual abuse," "medically appropriate," and "not of a sexual nature" from a "world-renowned" and "Olympic doctor," who "knew what he was doing" and that Plaintiff, because of their age and inexperience with intra-vaginal treatment, pelvic, vaginal, anal, and/or breast exams, "didn't understand the 'nuanced difference' between sexual assault and an appropriate medical procedure;"

aa. Plaintiff reasonably and justifiably relied on the MSU Defendants to protect them; and

bb. Plaintiff was compelled by the MSU Defendants to undergo "treatments" like other athletes if they wanted to continue participating and competing in their relevant sport and therefore the "treatments" were legitimate and appropriate.

314.  Back in 1992, Plaintiff was told that there was nothing that she could do about the sexual abuse that she suffered and to forget about it.

315.  Plaintiff repressed these memories as best as she could, but then saw herself on television as one of the girls in Defendant Nassar's training videos.  This caused her to recall what he did to her.

316.  The actions and inactions of the MSU Defendants and Defendant Nassar, as described in the preceding paragraphs, constituted Fraudulent Concealment.

317.  At all times pertinent to this action, Defendant Nassar was an agent, apparent agent, servant, and employee of Defendant MSU and operated within the scope of his employment and his Fraudulent Concealment is imputed to Defendant MSU.

318.  The actions and inactions of the sports medicine trainers, employees, staff, managers, supervisors, directors, and the MSU Defendants, as described in the preceding paragraphs constituted Fraudulent Concealment.

319. At all times material hereto, Plaintiff was entirely free of any negligence contributing to the injuries and damages hereinafter alleged.

## C. **DEFENDANT USA GYMNASTICS**

320. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

321. Plaintiff sought and received medical treatment from Defendant USAG and was in a special relationship with Defendant USAG due to its provision of medical treatment to its athletes.

322. Given the special relationship, Defendant USAG had a duty to disclose and to warn and protect the athletes and patients who sought treatment at its sanctioned events and member gyms with its doctor.

323. Plaintiff incorporates by reference the Fraud claims made below and hereby alleges that Defendant USAG committed Fraudulent Concealment by committing Fraud, as described in detail above and below, and concealing the existence of Plaintiff's claims and that Plaintiff had a cause of action against Defendant Nassar and/or Defendant USAG at the time his sexual assaults occurred by Defendant Nassar making a material representation(s) to Plaintiff involving a past or existing fact by:

    a. Making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

    b. Making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

    c. Making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

    d. Making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

e.  Making the statement, explaining, that his acts and/or conduct was medical "treatment" for a legitimate medical purpose and that it was the same that he performed on Olympic athletes;

f.  Making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

g.  Making a statement, explaining to Plaintiff and another medical professional that the position of his hand was in an appropriate place—when it was not—and while he was digitally penetrating Plaintiff, all of which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

324.  The material representation(s) to Plaintiff by Defendant Nassar were false, in that he was actually performing them for his own sexual gratification and pleasure evidenced by his observed arousal, flushed face, and closing of the eyes during the conduct.

325.  When Defendant Nassar made the material representation(s), he knew that they were false, in that he knew that the "treatment[s]" were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty and/or sports therapist.

326.  Defendant Nassar made the material representation(s) with the intent that the material representation(s) should be acted upon by Plaintiff, in that Plaintiff:

a.  Should believe that the "treatments" were in fact "treatments;"

b.  Should believe that the "treatment[s]" were proper, appropriate, and legitimate;

c.  Should not believe that they had been sexually assaulted; should not believe that they had been sexually assaulted so that he could prevent discovery of his sexual assaults;

d.  Should continue the "treatment[s]" so that he could continue to sexually assault them;

e.  Should not question and/or report the conduct to appropriate authorities; and,

    f.   Should not reasonably believe and not be aware of a possible cause of action that they have against Defendant Nassar and/or Defendant USAG.

327.  Plaintiff acted in reliance upon Defendant Nassar's material representation(s), in that Plaintiff:

    a.   Reasonably believed that the "treatments" were in fact "treatments;"

    b.   Reasonably believed that the "treatments" were proper, appropriate, and legitimate;

    c.   Reasonably did not believe that she had been sexually assaulted;

    d.   Believed that she should continue the "treatment[s];"

    e.   Did not believe that she should question and/or report the conduct to appropriate authorities; and did not reasonably believe that she had and was not aware of a possible cause of action that she had against Defendant Nassar and/or Defendant USAG.

328.  Plaintiff thereby suffered injury, in that Plaintiff:

    a.   Could not stop the sexual assault;

    b.   Continued to undergo the "treatment[s]" and sexual assaults; and,

    c.   Suffered discomfort, bleeding, urinary tract infections, bacterial infections, related physical manifestations thereof, sleep deprivation, physical illness, vomiting, severe emotional distress, shock, humiliation, fright, grief, embarrassment, loss of self-esteem, disgrace, loss of familial relationships, loss of enjoyment of life and will continue to suffer pain of mind and body, were prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity, among other injuries more fully described below.

329.  Defendant Nassar concealed the fraud by making a fraudulent material representation(s) to Plaintiff that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he made a material representation(s) to Plaintiff involving a past or existing fact by:

a. Making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

b. Making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

c. Making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

d. Making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

e. Making the statement, explaining, that his acts and/or conduct was "treatment" and that it was the same that he performed on Olympic athletes;

f. Making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

g. Making a statement, explaining to Plaintiff and another medical professional that the position of his hand was in an appropriate place—when it was not—and while he was digitally penetrating Plaintiff, all which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

330. Defendant Nassar concealed the fraud by an affirmative act(s) that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he:

a. Positioned himself in a manner in which parents or chaperones in the room could not see his conduct, so that he could conceal and prevent discovery of his conduct;

b. Dismissed a medical professional from the room, during an examination of Plaintiff while he was digitally penetrating Plaintiff, who questioned the placement of his hands;

c. Prevented other medical professionals, chaperones, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiff so that he could sexually assault Plaintiff;

d. Did not abide by or follow the standard and care which requires another medical professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients;

e. Did not abide by or follow Defendant USAG's Code of Ethics, Participant Welfare Policy, Safety/Risk Management Certification, principles in Gymnastics Risk Management Safety Course Handbook, and Prohibited Conduct policy, which he was a part of creating by not examining patients in the presence of a parent, chaperone, guardian, and/or caregiver; and,

f. Gave Plaintiff, at appointments, gifts such as t-shirts, pins, flags, leotards, and other items, some with USAG logos and others without, in order to gain their trust.

331. The actions and inactions of Defendant Nassar, as described in the preceding paragraphs, constituted Fraudulent Concealment.

332. At all times pertinent to this action, Defendant Nassar was an agent, apparent agent, servant, and employee of Defendant USAG and operated within the scope of his employment and his Fraudulent Concealment is imputed to Defendant USAG.

333. At all times material hereto, Plaintiff was entirely free of any negligence contributing to the injuries and damages hereinafter alleged.

### D.    DEFENDANTS TWISTARS & JOHN GEDDERT

334. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

335. Plaintiff sought and received medical treatment from Defendants Twistars and Geddert and were in a special relationship with Defendants Twistars and Geddert due to their provision of medical treatment to their athletes.

336. Given the special relationship, Defendants Twistars and Geddert had a duty to disclose and to warn and protect the athletes and patients who sought treatment at its sanctioned events and facilities with its doctor.

337. Plaintiff incorporates by reference the Fraud claims made below and hereby alleges that Defendant Twistars and Defendant John Geddert committed Fraudulent Concealment by committing Fraud, as described in detail above and below, and concealing the existence of

Plaintiff's claims and that Plaintiff had a cause of action against Defendant Nassar and/or Defendant Twistars and Defendant John Geddert at the time his sexual assaults occurred by Defendant Nassar making a material representation(s) to Plaintiff involving a past or existing fact by:

    a. Making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

    b. Making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

    c. Making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

    d. Making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

    e. Making the statement, explaining, that his acts and/or conduct was medical "treatment" for a legitimate medical purpose and that it was the same that he performed on Olympic athletes;

    f. Making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

    g. Making a statement, explaining to Plaintiff and another medical professional that the position of his hand was in an appropriate place—when it was not—and while he was digitally penetrating Plaintiff, all of which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

338. The material representation(s) to Plaintiff by Defendant Nassar were false, in that he was actually performing them for his own sexual gratification and pleasure evidenced by his observed arousal, flushed face, and closing of the eyes during the conduct.

339. When Defendant Nassar made the material representation(s), he knew that they were false, in that he knew that the "treatment[s]" were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty and/or sports therapist.

340. Defendant Nassar made the material representation(s) with the intent that the material representation(s) should be acted upon by Plaintiff, in that Plaintiff:

    a. Should believe that the "treatments" were in fact "treatments;"

    b. Should believe that the "treatment[s]" were proper, appropriate, and legitimate;

    c. Should not believe that she had been sexually assaulted; should not believe that she had been sexually assaulted so that he could prevent discovery of his sexual assaults;

    d. Should continue the "treatment[s]" so that he could continue to sexually assault them;

    e. Should not question and/or report the conduct to appropriate authorities; and,

    f. Should not reasonably believe and not be aware of a possible cause of action that she had against Defendant Nassar and/or Defendant Twistars or Defendant Geddert.

341. Plaintiff acted in reliance upon Defendant Nassar's material representation(s), in that Plaintiff:

    a. Reasonably believed that the "treatments" were in fact "treatments;"

    b. Reasonably believed that the "treatments" were proper, appropriate, and legitimate;

    c. Reasonably did not believe that she had been sexually assaulted;

    d. Believed that they should continue the "treatment[s];"

    e. Did not believe that she should question and/or report the conduct to appropriate authorities; and did not reasonably believe that she had and was not aware of a possible cause of action that she had against Defendant Nassar and/or Defendant Twistars or Defendant Geddert.

342. Plaintiff thereby suffered injury, in that Plaintiff:

    a. Could not stop the sexual assault;

    b. Continued to undergo the "treatment[s]" and sexual assaults; and,

    c. Suffered discomfort, bleeding, urinary tract infections, bacterial infections, related physical manifestations thereof, sleep deprivation, physical illness, vomiting, severe emotional distress, shock, humiliation, fright, grief, embarrassment, loss of self-esteem, disgrace, loss of familial relationships, loss of enjoyment of life and will continue to suffer pain of mind and body, were prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity, among other injuries more fully described below.

343. Defendant Nassar concealed the fraud by making a fraudulent material representation(s) to Plaintiff that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he made a material representation(s) to Plaintiff involving a past or existing fact by:

    a. Making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

    b. Making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

    c. Making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

    d. Making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

    e. Making the statement, explaining, that his acts and/or conduct was medical "treatment" for a legitimate medical purpose and that it was the same that he performed on Olympic athletes;

    f. Making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [her] ribs;" and,

    g. Making a statement, explaining to Plaintiff and another medical professional that the position of his hand was in an appropriate place—when it was not—and while he was digitally penetrating Plaintiff, all which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

344. Defendant Nassar concealing the fraud by an affirmative act(s) that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he:

    a. Positioned himself in a manner in which parents or chaperones in the room could not see his conduct, so that he could conceal and prevent discovery of his conduct;

    b. Dismissed a medical professional from the room, during an examination of Plaintiff while he was digitally penetrating Plaintiff, who questioned the placement of his hands;

    c. Prevented other medical professionals, chaperones, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiff so that he could sexually assault Plaintiff;

    d. Did not abide by or follow the standard and care which requires another medical professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients;

    e. Did not abide by or follow Defendant USAG's Code of Ethics, Participant Welfare Policy, Safety/Risk Management Certification, principles in Gymnastics Risk Management Safety Course Handbook, and Prohibited Conduct policy, or any similar policies established by Defendant Twistars or Defendant Geddert, by not examining patients in the presence of a parent, chaperone, guardian, and/or caregiver; and,

    f. Gave Plaintiff, at appointments, gifts such as t-shirts, pins, flags, leotards, and other items, some with USAG logos and others without, in order to gain their trust.

345. The actions and inactions of Defendant Nassar, as described in the preceding paragraphs, constituted Fraudulent Concealment.

346. At all times pertinent to this action, Defendant Nassar was an agent, apparent agent, servant, and employee of Defendant Twistars and Defendant Geddert and operated within the scope of his employment and his Fraudulent Concealment is imputed to Defendant Twistars and Defendant Geddert.

347. At all times material hereto, Plaintiff was entirely free of any negligence contributing to the injuries and damages hereinafter alleged.

### E.     **DEFENDANT NASSAR**

348.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

349.   Plaintiff had a special relationship with Defendant Nassar given their physician-patient relationship.

350.   Given the special relationship, Defendant Nassar had an affirmative duty to disclose and to warn and protect athletes and patients who sought his medical treatment from sexual abuse, assault, and molestation.

351.   Plaintiff hereby alleges that Defendant Nassar committed Fraudulent Concealment by committing Fraud, as described in detail above and below, and concealing the existence of Plaintiff's claims and that Plaintiff had a cause of action against Defendant Nassar and/or Defendant MSU at the time his sexual assaults occurred making a material representation(s) to Plaintiff involving a past or existing fact by:

    a.   Making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

    b.   Making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

    c.   Making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

    d.   Making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

    e.   Making the statement, explaining, that his acts and/or conduct was medical "treatment" for a legitimate medical purpose and that it was the same that he performed on Olympic athletes;

    f.   Making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

g.  Making a statement, explaining to Plaintiff and another medical professional that the position of his hand was in an appropriate place—when it was not—and while he was digitally penetrating Plaintiff, all of which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

352.  The material representation(s) to Plaintiff by Defendant Nassar were false, in that he was actually performing them for his own sexual gratification and pleasure evidenced by his observed arousal, flushed face, and closing of the eyes during the conduct.

353.  When Defendant Nassar made the material representation(s), he knew that they were false, in that he knew that the "treatment[s]" were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty and/or sports therapist.

354.  Defendant Nassar made the material representation(s) with the intent that the material representation(s) should be acted upon by Plaintiff, in that Plaintiff:

a.  Should believe that the "treatments" were in fact "treatments;"

b.  Should believe that the "treatment[s]" were proper, appropriate, and legitimate;

c.  Should not believe that she had been sexually assaulted; should not believe that she had been sexually assaulted so that he could prevent discovery of his sexual assaults;

d.  Should continue the "treatment[s]" so that he could continue to sexually assault her;

e.  Should not question and/or report the conduct to appropriate authorities; and,

f.  Should not reasonably believe and not be aware of a possible cause of action that she has against Defendant Nassar and/or Defendant Twistars or Defendant Geddert.

355.  Plaintiff acted in reliance upon Defendant Nassar's material representation(s), in that Plaintiff:

a.  Reasonably believed that the "treatments" were in fact "treatments;"

b.  Reasonably believed that the "treatments" were proper, appropriate, and legitimate;

c.  Reasonably did not believe that she had been sexually assaulted;

    d.  Believed that she should continue the "treatment[s];"

    e.  Did not believe that she should question and/or report the conduct to appropriate authorities; and did not reasonably believe that she had and was not aware of a possible cause of action that she had against Defendant Nassar and/or Defendant Twistars or Defendant Geddert.

356.   Plaintiff thereby suffered injury, in that Plaintiff:

    a.  Could not stop the sexual assault;

    b.  Continued to undergo the "treatment[s]" and sexual assaults; and,

    c.  Suffered discomfort, bleeding, urinary tract infections, bacterial infections, related physical manifestations thereof, sleep deprivation, physical illness, vomiting, severe emotional distress, shock, humiliation, fright, grief, embarrassment, loss of self-esteem, disgrace, loss of familial relationships, loss of enjoyment of life and will continue to suffer pain of mind and body, were prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity, among other injuries more fully described below.

357.   Defendant Nassar concealed the fraud by making a fraudulent material representation(s) to Plaintiff that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he made a material representation(s) to Plaintiff involving a past or existing fact by:

    a.  Making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

    b.  Making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

    c.  Making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

    d.  Making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

e. Making the statement, explaining, that his acts and/or conduct was medical "treatment" for a legitimate medical purpose and that it was the same that he performed on Olympic athletes;

f. Making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

g. Making a statement, explaining to Plaintiff and another medical professional that the position of his hand was in an appropriate place—when it was not—and while he was digitally penetrating Plaintiff, all which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

358. Defendant Nassar concealing the fraud by an affirmative act(s) that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he:

a. Positioned himself in a manner in which parents or chaperones in the room could not see his conduct, so that he could conceal and prevent discovery of his conduct;

b. Dismissed a medical professional from the room, during an examination of Plaintiff while he was digitally penetrating Plaintiff, who questioned the placement of his hands;

c. Prevented other medical professionals, chaperones, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiff so that he could sexually assault Plaintiff;

d. Did not abide by or follow the standard and care which requires another medical professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients;

e. Did not abide by or follow Defendant USAG's Code of Ethics, Participant Welfare Policy, Safety/Risk Management Certification, principles in Gymnastics Risk Management Safety Course Handbook, and Prohibited Conduct policy, or any similar policies established by Defendant Twistars or Defendant Geddert, by not examining patients in the presence of a parent, chaperone, guardian, and/or caregiver; and,

f. Gave Plaintiff, at appointments, gifts such as t-shirts, pins, flags, leotards, and other items, some with USAG logos and others without, in order to gain their trust.

359.   The actions and inactions of Defendant Nassar, as described in the preceding paragraphs, constituted Fraudulent Concealment.

360.   At all times pertinent to this action, Defendant Nassar was an agent, apparent agent, servant, and employee of Defendants MSU, USAG, and Twistars and operated within the scope of his employment and his Fraudulent Concealment is imputed to Defendants MSU, USAG, and Twistars.

361.   At all times material hereto, Plaintiff was entirely free of any negligence contributing to the injuries and damages hereinafter alleged.

## VII.      CLAIMS AGAINST MICHIGAN STATE UNIVERSITY DEFENDANTS

### F.     A.     COUNT ONE

**VIOLATIONS OF TITLE IX**
**20 U.S.C. §1681(a),** *et seq.*
**PLAINTIFF AGAINST DEFENDANTS MSU AND MSU TRUSTEES**

362.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

363.   Title IX's statutory language states, "No *person* in the United States shall on the basis of sex, be … subject to discrimination under any education program or activity receiving Federal financial assistance …"[33]

364.   Plaintiff is a "person" under the Title IX statutory language.

365.   Defendant MSU receives federal financial assistance for its education program and is therefore subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. § 1681(a), *et seq.*

---

[33] 20 U.S.C. § 1681(a) (emphasis added).

366.   Defendant MSU is required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

367.   The U.S. Department of Education's Office of Civil Rights has explained that Title IX covers all programs of a school, and extends to sexual harassment and assault by employees, students and third parties.[34]

368.   Defendant Nassar's actions and conduct were carried out under one of Defendant MSU's education programs or activities, which provides medical treatment to students, athletes, and the public.

369.   Defendant Nassar's conduct and actions toward Plaintiff, that being nonconsensual digital vaginal and anal penetration, touching of Plaintiff's vaginal area, and touching of Plaintiff's breasts constitutes sex discrimination under Title IX.

370.   As early as 1997, an "appropriate person" at Defendant MSU had actual knowledge of the sexual assault, abuse, and molestation committed by Defendant Nassar by virtue of Larisa Boyce's statements to Defendant Klages regarding her sexual assault by Defendant Nassar.

371.   In addition, Defendant MSU was aware that Defendant Nassar sexually assaulted Plaintiff in 1992 and rather than investigate and take affirmative actions to cease this unlawful conduct, the defendants covered up and/or concealed what happened.

372.   Given the response by defendants to Plaintiff Erika's complaints, it is clear that defendant MSU was aware and/or had notice that Defendant Nassar sexually assaulted other girls, children and/or young women.

373.   Larisa Boyce's statements to Defendant Klages were further corroborated to Defendant

---

[34] U.S. Dept. of Ed., Office of Civil Rights, Q & A on Title IX and Sexual Misconduct, Sept. 22, 2017, at 1, 2, 3, https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

Klages by other athletes.

374. In addition, the MSU Defendants were notified about Defendant Nassar's sexual abuse and molestation by Christie Achenbach in or around 1999 and by Tiffany Thomas Lopez in 2000 on more than one occasion.

375. Among the persons notified about Defendant Nassar's sexual abuse was Defendant Teachnor-Hauk, who was serving in a supervisory role to other athletic trainers and was an "appropriate person."

376. In approximately 2001 or 2002, Jennifer Rood Bedford, an MSU student athlete on the women's volleyball team, was sexually assaulted and abused during "treatment" by Defendant Nassar and reported Defendant Nassar's conduct to Defendant MSU's employees, including trainers.[35]

377. According to Ms. Bedford, Nassar was known among the women's volleyball team as the "crotch doc" because of his "unconventional methods" of treating sports injuries with vaginal penetrations.

378. Ms. Bedford was extremely uncomfortable with the fact that she had been assaulted and reported the incident to MSU athletic trainer Lianna Hadden.

379. Ms. Hadden dissuaded Ms. Bedford from filing a formal complaint against Nassar because it would result in an investigation against Nassar, making an accusation against Nassar and statement that she felt that what Nassar did was unprofessional or criminally wrong.

---

[35] See Nassar Victim: Jennifer Rood Bedford Statement, Jan. 16, 2018, Available at https://www.clickondetroit.com/video/nassar-victim-jennifer-rood-bedford-statement. Last accessed January 16, 2018.

380.   Upon information and belief, in approximately 2004, Defendant Gary E. Stollak was told by Kyle Stephens—then 11 or 12 years old—that she had been abused by Defendant Nassar.

381.   Defendant Stollak did not report the abuse to law enforcement or to child protective services.

382.   The MSU Defendants failed to carry out their duties to investigate and take corrective action under Title IX following the complaints of sexual assault, abuse, and molestation in or around 1997/1998, 1999, 2000, 2001/2002, and 2004.

383.   The MSU Defendants were notified again in 2014 of Defendant Nassar's conduct when Amanda Thomashow reported she had an appointment with Defendant Nassar to address hip pain and was sexually abused and molested by Defendant Nassar when he cupped her buttocks, massaged her breast and vaginal area, and he became sexually aroused.[36]

384.   Amanda Thomashow reported to Defendant MSU facts which were omitted or withheld from the investigative report including but not limited to the following:

   a.   Defendant Nassar was sexually aroused while touching her;

   b.   The appointment with Defendant Nassar did not end until she physically removed his hands from her body.

385.   Three months after initiating an investigation, in July 2014, Amanda Thomashow's complaints were dismissed and Defendant MSU determined she didn't understand the "nuanced difference" between sexual assault and an appropriate medical procedure and deemed Defendant Nassar's conduct "medically appropriate" and "Not of a sexual

---

[36] *See*, At MSU: Assault, harassment and secrecy. Matt Mencarini, December 15, 2016. Available at      http://www.lansingstatejournal.com/story/news/local/2016/12/15/michigan-state-sexual-assault- harassment-larry-nassar/94993582/, last accessed January 5, 2017.

nature."[37]

386.   In addition, MSU produced two different versions of the report in response to the July 2014 investigation—one version was sent to Amanda Thomashow and a different version was sent to Defendant Nassar and other MSU personnel.

387.   Following the 2014 investigation, Defendant Nassar became subject to new institutional guidelines, including requirements that Defendant Nassar minimize or eliminate skin-to-skin contact and to have a chaperone in the room.[38]

388.   The MSU Defendants failed to adequately supervise or otherwise ensure Defendant Nassar complied with the newly imposed institutional guidelines even though the MSU Defendants had actual knowledge that Defendant Nassar posed a substantial risk of additional sexual abuse of the females whom he had unfettered access.

389.   After the 1992, 1997/1998, 1999, 2000, 2001/2002, and 2014 complaints to MSU employees or agents, Defendant Nassar continued to sexually assault, abuse, and molest individuals.

390.   The MSU Defendants acted with deliberate indifference to known acts of sexual assault, abuse, and molestation on its premises by:

   a.   failing to investigate and address the prior allegations as required by Title IX;

   b.   failing to adequately investigate and address the 1997, 1999, 2000, 2001/2002, and 2014 complaints regarding Defendant Nassar's conduct; and,

   c.   failing to institute corrective measures to prevent Defendant Nassar from violating and sexually abusing other students and individuals, including minors.

391.   The MSU Defendants acted with deliberate indifference as its lack of response to the

---

[37] *Id.*
[38] *Id.*

allegations of sexual assault, abuse, and molestation was clearly unreasonable in light of the known circumstances, including Defendant Nassar's actions with patients, female athletes, and his access to young girls and young women.

392. The MSU Defendants' deliberate indifference was confirmed by the Department of Education's investigation into Defendant MSU's handling of sexual assault and relationship violence allegations which revealed:

   a. A sexually hostile environment existed and affected numerous students and staff on Defendant MSU's campus;

   b. That the University's failure to address complaints of sexual harassment, including sexual violence in a prompt and equitable manner caused and may have contributed to a continuation of the sexually hostile environment.[39]

393. The MSU Defendants' responses were clearly unreasonable as Defendant Nassar continued to sexually assault female athletes, patients, and other individuals until he was discharged from the University in September 2016.

394. Between the dates of approximately 1992 and 2016, the MSU Defendants acted in a deliberately indifferent, grossly negligent, and/or reckless manner when they failed to reasonably respond to Defendant Nassar's sexual assaults and sex-based harassment of Plaintiff on and off school premises.

395. The MSU Defendants' failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after they received repeated notice of Defendant Nassar's wrongdoing subjected Plaintiff and countless others to further sexual harassment and sexual assaults as well as a sexually hostile environment—effectively denying them all

---

[39] *See,* Letter from U.S. Department of Education Office for Civil Rights to Michigan State University, September 1, 2015, OCR Docket #15-11-2098, #15-14-2113. Available at https://www2.ed.gov/documents/press-releases/michigan-state-letter.pdf. Last accessed January 4, 2017.

access to educational opportunities at MSU, including medical care.

396.   As a direct and/or proximate result of the MSU Defendants' actions and/or inactions, Plaintiff has suffered and continues to suffer pain and suffering, pain of mind and body, pregnancy and miscarriage and sequelae thereto, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, trauma, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

397.   In the alternative, the actions or inaction of the MSU Defendants was deliberately indifferent or so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, trauma loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

B.     **COUNT TWO**

**SEX DISCRIMINATION**
**42 U.S.C. § 18116 (PATIENT PROTECTION AND AFFORDABLE CARE ACT § 1557)**
**PLAINTIFF AGAINST DEFENDANTS MSU AND MSU TRUSTEES**

398.    Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

399.    Section 1557 of the Patient Protection and Affordable Care Act, which is codified at 42 U.S.C. § 18116, provides that:

> Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under . . . title IX shall apply for purposes of violations of this subsection.

400.    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* prohibits sex discrimination in programs that receive federal financial assistance.

401.    Plaintiff as a female has a right under 42 U.S.C. § 18116 to receive health care services free from discrimination on the basis of sex.

402.    Plaintiff is an "individual" within the meaning of 42 U.S.C. § 18116.

403.    Defendant MSU receives Federal financial assistance within the meaning of 42 U.S.C. § 18116 because it receives federal financial assistance such as credits, subsidies, or contracts of insurance.

404.    Defendant Nassar's conduct and actions toward Plaintiff, that being nonconsensual digital vaginal and anal penetration, touching of Plaintiff's vaginal area, touching of Plaintiff's breasts, and rape constitutes sex discrimination under Title IX and 42 U.S.C. § 18116.

405.    The conduct of Defendants MSU and MSU Trustees described above constitutes sex discrimination against Plaintiff.

406.    Defendants MSU and MSU Trustees perpetrated this discrimination with malice, deliberate disregard for, or deliberate or reckless indifference to Plaintiff's rights.

407.    The MSU Defendants' failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after they received repeated notice of Defendant Nassar's wrongdoing subjected Plaintiff and countless others to further sexual harassment and sexual assaults as well as a sexually hostile environment—effectively denying them all access to any health program or activity at MSU.

408.    As a direct and/or proximate result of the MSU Defendants' actions and/or inactions, Plaintiff has suffered and continue to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

409.    In the alternative, the actions or inaction of the MSU Defendants was deliberately indifferent or so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional

distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

**C.** **COUNT THREE**

**VIOLATION OF CIVIL RIGHTS**
**42 U.S.C. § 1983**
**PLAINTIFF AGAINST DEFENDANT KLAGES, DEFENDANT STRAMPEL,**
**DEFENDANT KOVAN, DEFENDANT DIETZEL, DEFENDANT LEMMEN,**
**DEFENDANT TEACHNOR-HAUK, DEFENDANT STOLLAK, AND DEFENDANT**
**NASSAR**

410. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

411. Plaintiff, as a female, is a member of a protected class under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

412. Plaintiff also enjoys the constitutionally protected substantive due process right to be free from the invasion of bodily integrity through rape, sexual assault, abuse, or molestation under the Fourteenth Amendment to the United States Constitution.

413. At all relevant times, Defendants Klages, Strampel, Kovan, Dietzel, Lemmen, Teachnor-Hauk, Stollak, and Nassar were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendant Michigan State University.

414. The acts as alleged above amount to a violation of these clearly established constitutionally

protected rights, including the right to be free from sexual assault, of which reasonable persons in their positions should have known.

415. At all relevant times, Defendants Klages, Strampel, Dietzel, and Kovan had the ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives, in the appropriate manner of detecting, reporting, and preventing sexual abuse, assault, and molestation and as a matter of acts, custom, policy, and/or practice, failed to do so with deliberate indifference.

416. At all relevant times, Defendants Strampel, Dietzel, and Kovan acted in a supervisory role to Defendant Nassar through their roles at Defendant MSU's Sports Medicine Clinic, MSU's College of Osteopathic Medicine, and other affiliated MSU departments or institutions.

417. At all relevant times, Defendant Klages, as the head coach of the MSU Women's Gymnastics Team, acted in a supervisory role to Defendant Nassar while he was acting as team physician to the MSU Women's Gymnastics Team.

418. As a matter of custom, policy, and/or practice, Defendant Klages had the ultimate responsibility and authority to investigate complaints from her athletes that involved allegations of impropriety or sexual assault by her team physician.

419. As a matter of custom, policy, and/or practice, Defendants Klages, Strampel, Dietzel, and Kovan had and have the ultimate responsibility and authority to investigate complaints against their employees, agents, and representatives from all individuals including, but not limited to students, patients, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

420. Defendant Lemmen's actions in assisting to exonerate Defendant Nassar from wrongdoing

in response to the 2014 Title IX investigation and Defendant Lemmen's removal of Defendant Nassar's patient medical records from Defendant MSU's Sports Medicine Clinic at Defendant Nassar's request demonstrate the existence of an agreement or conspiracy between Defendant Nassar and Defendant Lemmen to deprive Plaintiff of her constitutional rights.

421. Defendant Teachnor-Hauk's actions in assisting to exonerate Defendant Nassar from wrongdoing in response to the 2014 Title IX investigation, her statements to discourage Tiffany Thomas Lopez from pursuing further action against Defendant Nassar, and her statements to law enforcement denying the existence of any prior complaints about Defendant Nassar demonstrate the existence of an agreement or conspiracy between Defendant Nassar and Defendant Teachnor-Hauk to deprive Plaintiff of her constitutional rights.

422. Defendants Klages, Strampel, Dietzel, Lemmen, Kovan, Teachnor-Hauk, Stollak, and Nassar had a duty to prevent sexual assault, abuse, and molestation of MSU's patients, athletes, and other members of the public who utilize MSU's resources, those duties arising under the above-referenced constitutional rights.

423. Defendant MSU's internal policies provide that "[a]ll University employees ... are expected to promptly report sexual misconduct or relationship violence that they observe or learn about and that involves a member of the University community (faculty, staff or student) or occurred at a University event or on University property." They state further: "[t]he employee must report all relevant details about the alleged relationship violence or sexual misconduct that occurred on campus or at a campus-sponsored event . . . ."

424. Defendant Klages violated the aforementioned internal policies in or around 1997 when

Larisa Boyce and other athletes told Defendant Klages that they had been sexually assaulted by Defendant Nassar, and Defendant Klages refused to report the incident and instead intimidated, humiliated, and embarrassed Larisa Boyce and other athletes.

425.    Defendant Klages's violation of the policy by refusing to take any action in response to legitimate and credible claims of sexual assault by P Larisa Boyce and other athletes resulted in Plaintiff's continued violations of their constitutional rights, including their Due Process right to bodily integrity, which includes the right to be free from sexual assaults.

426.    Defendant Klages's actions as alleged above also demonstrate the existence of an agreement or conspiracy between Defendant Nassar and Defendant Klages to deprive Plaintiff of her constitutional rights.

427.    Defendant MSU's aforementioned internal policies were violated in or around 1999 when Christie Achenbach reported sexual assault, abuse, and molestation by Defendant Nassar to MSU representatives including trainers and coaches, including Kelli Bert, and no action was taken to address her complaints.

428.    Defendant MSU's aforementioned internal policies were also violated in or around 2000 when Tiffany Thomas Lopez reported sexual assault, abuse, and molestation by Defendant Nassar to Defendant Teachnor-Hauk and other MSU representatives, including trainers, and no action was taken to address her complaints.

429.    Defendant MSU's aforementioned internal policies were also violated in or around 2001/2002 when Jennifer Rood Bedford reported sexual assault, abuse, and molestation by Defendant Nassar to Lianna Hadden and other MSU representatives, including trainers, and no action was taken to address her complaints.

430.    At all relevant times, Defendant MSU had a policy requiring MSU employees to

immediately report suspected child abuse, sexual assault, and child pornography.[40]

431. Defendant Klages violated this policy in or around 1997/1998.

432. Defendant Teachnor-Hauk violated this policy in or around 2000.

433. Defendant Stollak violated this policy in or around 2004.

434. Ultimately Defendants Klages, Strampel, Dietzel, Lemmen, Kovan, Stollak, Teachnor-Hauk failed to adequately and properly investigate the complaints of Plaintiff or other similarly situated individuals including but not limited to failing to:

    a.     Perform a thorough investigation into improper conduct by Defendant Nassar with Plaintiff after receiving complaints in or before 1992, 1997/1998, 1999, 2000, 2001/2002, 2004, and 2014;

    b.     Thoroughly review and investigate all policies, practices, procedures, and training materials related to the circumstances surrounding the conduct of Defendant Nassar;

    c.     Recognize sexual assault when reported in 2014 and permitted university officials to deem sexual assault as "medically appropriate" and "not of a sexual nature;" and

    d.     Ensure all institutional guidelines issued following the 2014 investigation into Defendant Nassar's conduct were satisfied.

435. As indicated in the U.S. Department of Education Office of Civil Rights report, the MSU Defendants had a culture that permitted a sexually hostile environment to exist affecting

---

[40] *See*, President Lou Anna K. Simon reminds Michigan State employees of obligation to report sexual assault, Brandon Howell, August 17, 2012, available at, http://www.mlive.com/lansing-news/index.ssf/2012/08/president_lou_anna_k_simon_rem.html, Last accessed Feb. 17, 2018 ("Simon writes in the e-mail … 'I write to remind University employees about the reporting protocols for suspected child abuse, child pornography, and allegations of sexual assault.' Jason Cody, a spokesperson for the university said the protocols outlined in Simon's email **'long have been in place for employees.'**")(emphasis added).

numerous individuals on Defendant MSU's campus, including Plaintiff.

436.  Also indicated in the report was Defendant MSU's custom, practice, and/or policy of failing to address complaints of sexual harassment, including sexual violence in a prompt and equitable manner which caused and may have contributed to a continuation of the sexually hostile environment.

437.  By failing to prevent the aforementioned sexual assault, abuse, and molestation upon Plaintiff, and by failing to appropriately respond to reports of Defendant Nassar's sexual assault, abuse, and molestation that was so clearly unreasonable that it amounted to gross negligence and deliberate indifference, Defendants Klages, Strampel, Dietzel, Lemmen, Teachnor-Hauk, Kovan, and Stollak are liable to Plaintiff pursuant to 42 U.S.C. § 1983.

438.  Defendants Klages, Strampel, Dietzel, Lemmen, Teachnor-Hauk, Kovan, and Stollak are also liable to Plaintiff under 42 U.S.C. § 1983 for maintaining customs, policies, and practices which deprived Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution, including Plaintiff's constitutional right to bodily integrity.

439.  Defendants Klages, Strampel, Dietzel, Lemmen, Teachnor-Hauk, Stollak, and Kovan tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline Defendant Nassar, with the result that Defendant Nassar was allowed to violate the constitutional rights of persons such as Plaintiff with impunity.

440.  As a direct and/or proximate result of Defendants Klages, Strampel, Dietzel, Lemmen, Teachnor-Hauk, Kovan, Stollak, and Nassar's actions and/or inactions, Plaintiff has suffered and continues to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of

self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

441.    In the alternative, the actions or inactions of Defendants Klages, Strampel, Dietzel, Lemmen, Teachnor-Hauk, Stollak, and Kovan were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff has suffered and continues to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

### C.    COUNT FOUR

**FAILURE TO TRAIN AND SUPERVISE**
**42 U.S.C. § 1983**
**PLAINTIFF AGAINST DEFENDANT KLAGES, DEFENDANT STRAMPEL,**
**DEFENDANT DIETZEL, AND DEFENDANT KOVAN**

442.    Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

443.  Defendants Klages, Strampel, Dietzel, and Kovan have the ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives including Defendant Nassar and all faculty and staff regarding their duties toward athletes, students, faculty, staff, and visitors.

444.  Defendants Klages, Strampel, Dietzel, and Kovan failed to train and supervise their employees, agents, and/or representatives including all faculty and staff, regarding the following duties:

   a.  Perceive, report, and stop inappropriate sexual conduct on campus;

   b.  Provide diligent supervision over student-athletes and other individuals;

   c.  Report suspected incidents of sexual abuse or sexual assault;

   d.  Ensure the safety of all students, faculty, staff, and visitors to Defendant MSU's campuses premises;

   e.  Provide a safe environment for all students, faculty, staff, and visitors to Defendant MSU's premises free from sexual harassment; and,

   f.  Properly train faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

445.  The above list of duties is not exhaustive.

446.  Defendants Klages, Strampel, Dietzel, and Kovan failed to adequately train coaches, trainers, medical staff, and others regarding the aforementioned duties which led to violations of Plaintiff's rights.

447.  As a result, Defendants Klages, Strampel, Dietzel, and Kovan deprived Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

448.  As a direct and/or proximate result of Defendants Klages, Strampel, Dietzel, and Kovan's actions and/or inactions, Plaintiff has suffered and continues to suffer pain and suffering,

pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

449.    In the alternative, the actions or inaction of the Defendants Klages, Strampel, Dietzel, and Kovan were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

D.    **COUNT FIVE**

**GROSS NEGLIGENCE**
**M.C.L. § 600.1407(2)(c)**
**PLAINTIFF AGAINST THE MSU DEFENDANTS**
**AND DEFENDANT NASSAR**

450.    Plaintiff realleges and incorporates by reference the allegations contained in the previous

paragraphs.

451.   The MSU Defendants owed Plaintiff a duty to use due care to ensure her safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents, including Defendant Nassar.

452.   Defendant Nassar owed Plaintiff a duty of due care in carrying out medical treatment as an employee, agent, and/or representative of the MSU Defendants.

453.   By seeking medical treatment from Defendant Nassar in the course of his employment, agency, and/or representation of the MSU Defendants, a special, confidential, and fiduciary relationship between Plaintiff and Defendant Nassar was created, resulting in Defendant Nassar owing Plaintiff a duty to use due care.

454.   The MSU Defendants' failure to adequately supervise Defendant Nassar, especially after MSU knew or should have known of complaints regarding his nonconsensual sexual touching and assaults during "treatments" was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff.

455.   Defendant Nassar's conduct in sexually assaulting, abusing, and molesting and raping Plaintiff in the course of his employment, agency, and/or representation of the MSU Defendants and under the guise of rendering "medical treatment" was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff.

456.   The MSU Defendants' conduct demonstrated a willful disregard for precautions to ensure Plaintiff's safety.

457.   The MSU Defendants' conduct as described above, demonstrated a willful disregard for substantial risks to Plaintiff.

458.   The MSU Defendants breached duties owed to Plaintiff and were grossly negligent when

they conducted themselves by the actions described above, said acts having been committed with reckless disregard for Plaintiff's health, safety, Constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

459.    As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

460.    In the alternative, the actions or inaction of the Defendants was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

E. **COUNT SIX**

## NEGLIGENCE
## PLAINTIFF AGAINST THE MSU DEFENDANTS
## AND DEFENDANT NASSAR

461. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

462. The MSU Defendants owed Plaintiff a duty of ordinary care to ensure their safety and freedom from sexual assault, abuse, molestation and rape while interacting with their employees, representatives and/or agents.

463. By seeking medical treatment from Defendant Nassar in his capacity as an employee, agent, and/or representative of the MSU Defendants, a special, confidential, and fiduciary relationship between Plaintiff and Defendant Nassar was created, resulting in Defendant Nassar owing Plaintiff a duty to use ordinary care.

464. Defendant Nassar owed Plaintiff a duty of ordinary care.

465. The MSU Defendants' failure to adequately train and supervise Defendant Nassar breached the duty of ordinary care.

466. The MSU Defendants had notice through its own employees, agents, and/or representatives as early as 1992, again in 1997, again in 2000, and again in 2014 of complaints of a sexual nature related to Defendant Nassar's purported "treatments" with young girls and women.

467. The MSU Defendants should have known of the foreseeability of sexual abuse with respect to youth and collegiate sports.

468. The MSU Defendants' failure to properly investigate, address, and remedy complaints regarding Defendant Nassar's conduct was a breach of ordinary care.

469. Defendant Nassar's conduct in sexually assaulting, abusing, and molesting Plaintiff in the

course of his employment, agency, and/or representation of the MSU Defendants was a breach of the duty to use ordinary care.

470.    As a direct and/or proximate result of Defendants' conduct, actions and/or inactions, Plaintiff has suffered and continues to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

471.    In the alternative, the actions or inaction of the Defendants was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

**F.    <u>COUNT SEVEN</u>**

## VICARIOUS LIABILITY
## PLAINTIFF AGAINST THE MSU DEFENDANTS

472.  Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

473.  Vicarious liability is indirect responsibility imposed by operation of law where an employer is bound to keep its employees within their proper bounds and is responsible if it fails to do so.

474.  Vicarious liability essentially creates agency between the principal and its agent, so that the principal is held to have done what the agent has done.

475.  The MSU Defendants employed and/or held Defendant Nassar out to be its agent and/or representative from approximately 1992 to 2016.

476.  Defendant MSU's website contains hundreds of pages portraying Defendant Nassar as a distinguished member of Defendant MSU's College of Osteopathic Medicine, Division of Sports Medicine.[41]

477.  The MSU Defendants are vicariously liable for the actions of Defendant Nassar as described above that were performed during the course of his employment, representation, and/or agency with the MSU Defendants and while he had unfettered access to young female athletes on MSU's campus and premises through its College of Osteopathic Medicine and Division of Sports Medicine.

478.  As a direct and/or proximate result of Defendant Nassar's actions carried out in the course of his employment, agency, and/or representation of the MSU Defendants, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and

---

[41] As of January 5, 2017, using the search term "Nassar" at www.msu.edu returns 402 results, the majority of which include references to Defendant Nassar dating as far back as 1997.

sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

479.   In the alternative, the actions or inaction of the Defendants was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

### G.   COUNT EIGHT

### EXPRESS/IMPLIED AGENCY
### PLAINTIFF AGAINST MSU DEFENDANTS

480.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

481.   An agent is a person who is authorized by another to act on its behalf.

93

482. The MSU Defendants intentionally or negligently made representations that Defendant Nassar was their employee, agent, and/or representative.

483. On the basis of those representations, Plaintiff reasonably believed that Defendant Nassar was acting as an employee, agent, and/or representative of the MSU Defendants.

484. Plaintiff was injured as a result of Defendant Nassar's sexual assault, abuse, molestation and rape as described above, acts that were performed during the course of his employment, agency, and/or representation with the MSU Defendants and while he had unfettered access to young female athletes.

485. Plaintiff was injured because they relied on the MSU Defendants to provide employees, agents, and or representatives who would exercise reasonable skill and care.

486. As a direct and/or proximate cause of Defendant Nassar's negligence carried out in the course of his employment, agency, and/or representation of the MSU Defendants, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

487. In the alternative, the actions or inaction of the Defendants was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff

has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

**H.     COUNT NINE**

**NEGLIGENT SUPERVISION**
**PLAINTIFF AGAINST THE MSU DEFENDANTS**

488.    Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

489.    The MSU Defendants had a duty to provide reasonable supervision of their employee, agent, and/or representative, Defendant Nassar, while he was in the course of his employment, agency or representation with the MSU Defendants and while he interacted with young female athletes including Plaintiff.

490.    It was reasonably foreseeable given the known sexual abuse in youth sports and gymnastics in particular that Defendant Nassar who had prior allegations against him had or would sexually abuse children, including Plaintiff, unless properly supervised.

491.    The MSU Defendants by and through their employees, agents, managers and/or assigns, such as President Simon, President McPherson, Defendant Strampel or Defendant Kovan knew or reasonably should have known of Defendant Nassar's conduct and/or that Defendant Nassar was an unfit employee, agent, and/or representative because of his sexual

interest in children.

492. The MSU Defendants breached their duty to provide reasonable supervision of Defendant Nassar, and permitted Defendant Nassar, who was in a position of trust and authority, to commit the acts against Plaintiff.

493. The aforementioned sexual abuse occurred while Plaintiff and Defendant Nassar were on the premises of Defendant MSU, and while Defendant Nassar was acting in the course of his employment, agency, and/or representation of the MSU Defendants.

494. The MSU Defendants tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, with the result that Defendant Nassar was allowed to violate the rights of persons such as Plaintiff with impunity.

495. As a direct and/or proximate result of the MSU Defendants' negligent supervision, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

496. In the alternative, the actions or inaction of the Defendants was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff

has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

I. **COUNT TEN**

**NEGLIGENT FAILURE TO WARN OR PROTECT PLAINTIFF AGAINST THE MSU DEFENDANTS**

497. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

498. The MSU Defendants knew or should have known that Defendant Nassar posed a risk of harm to Plaintiff or those in Plaintiff's situation.

499. As early as 1992, the MSU Defendants had direct and/or constructive knowledge as to the dangerous conduct of Defendant Nassar and failed to act reasonably and responsibly in response.

500. The MSU Defendants knew or should have known that Defendant Nassar committed sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

501. The MSU Defendants had a duty to warn or protect Plaintiff and others in Plaintiff's situation against the risk of injury by Defendant Nassar.

502. The duty to disclose this information arose by the special, trusting, confidential, and fiduciary relationship between Defendant Nassar as an employee, agent, and or

representative of the MSU Defendants and Plaintiff.

503. The MSU Defendants breached said duty by failing to warn Plaintiff and/or by failing to take reasonable steps to protect Plaintiff from Defendant Nassar.

504. The MSU Defendants breached its duties to protect Plaintiff by failing to:

  a. Respond to allegations of sexual assault, abuse, and molestation;

  b. Detect and/or uncover evidence of sexual assault, abuse, and molestation; and,

  c. Investigate, adjudicate, and terminate Defendant Nassar's employment with Defendant MSU prior to 2016.

505. The MSU Defendants failed to adequately screen, counsel and/or discipline Defendant Nassar for physical and/or mental conditions that might have rendered him unfit to discharge the duties and responsibilities of a physician at an educational institution, resulting in violations of Plaintiff's rights.

506. The MSU Defendants explicitly concealed Defendant Nassar's sexual abuse of children, girls and young women.

507. The MSU Defendants willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiff from Defendant Nassar's conduct.

508. As a direct and/or proximate result of the MSU Defendants negligent failure to warn or protect, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full

enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

509.    In the alternative, the actions or inaction of the Defendants was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

**J.      COUNT ELEVEN**

**NEGLIGENT FAILURE TO TRAIN OR EDUCATE
PLAINTIFF AGAINST THE MSU DEFENDANTS**

510.    Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

511.    The MSU Defendants breached their duty to take reasonable protective measures to protect Plaintiff and other minors from the risk of childhood sexual abuse and/or sexual assault by Defendant Nassar, such as the failure to properly train or educate Plaintiff and other individuals (including minors) about how to avoid such a risk.

512.    The MSU Defendants failed to implement reasonable safeguards to:

        a.  Prevent acts of sexual assault, abuse, molestation and rape by Defendant Nassar;

b. Avoid placing Defendant Nassar in positions where he would be in unsupervised contact and interaction with Plaintiff and other young athletes.

513. As a direct and/or proximate result of the MSU Defendants' negligent failure to train or educate, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

514. In the alternative, the actions or inaction of the Defendants was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

### G.   K.   COUNT TWELVE

### NEGLIGENT RETENTION
### PLAINTIFF AGAINST THE MSU DEFENDANTS

515.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

516.   The MSU Defendants had a duty when credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising employees, agents and/or representatives to exercise due care, but they failed to do so.

517.   The MSU Defendants were negligent in the retention of Defendant Nassar as an employee, agent, and/or representative in their failure to adequately investigate, report and address complaints about his conduct of which they knew or should have known.

518.   The MSU Defendants were negligent in the retention of Defendant Nassar as an employee, agent, and/or representative when after they discovered, or reasonably should have discovered Defendant Nassar's conduct which reflected a propensity for sexual misconduct.

519.   The MSU Defendants' failure to act in accordance with the standard of care resulted in Defendant Nassar gaining access to and sexually abusing and/or sexually assaulting Plaintiff and an unknown number of other individuals.

520.   The aforementioned negligence in the credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising of Defendant Nassar created a foreseeable risk of harm to Plaintiff as well as other minors and young adults.

521.   As a direct and/or proximate result of the MSU Defendants' negligent retention, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations

of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

522.     In the alternative, the actions or inaction of the Defendants was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

### H.     L.     COUNT THIRTEEN

### FRAUD AND MISREPRESENTATION
### PLAINTIFF AGAINST MSU DEFENDANTS

523.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

524.     From approximately 1992 to September 2016, the MSU Defendants represented to Plaintiff and the public that Defendant Nassar was a competent and safe physician.

525. By representing that Defendant Nassar was a team physician and athletic physician at Defendant MSU and a National Team Physician with Defendant USAG, the MSU Defendants represented to Plaintiff and the public that Defendant Nassar was safe, trustworthy, of high moral and ethical repute, and that Plaintiff and the public need not worry about being harmed by Defendant Nassar.

526. The representations were false when they were made as Defendant Nassar had and was continuing to sexually assault, abuse, molest and rape Plaintiff and an unknown number of other individuals.

527. As of 1992, 1997, 1999, and 2000, the MSU Defendants knew their representations of Defendant Nassar were false as at least one student athlete in 1992, another in 1997, another in 1999, and Tiffany Thomas Lopez had complained of Defendant Nassar's conduct to MSU representatives.

528. Although MSU was informed of Defendant Nassar's conduct they failed to investigate, remedy, or in any way address the 1992, 1997, 1999, and 2000 complaints.

529. The MSU Defendants continued to hold Defendant Nassar out as a competent and safe physician.

530. Additional complaints against Defendant Nassar surfaced in 2014, however, because of Defendant MSU's culture which included existence of a sexually hostile environment on Defendant MSU's campus and premises and the University's failure to address complaints of sexual harassment, including sexual violence in a prompt and equitable manner which in turn caused and may have contributed to a continuation of the sexually hostile environment, Defendant Nassar was permitted to continue employment and sexually abuse,

assault, and molest Plaintiff and an unknown number of other individuals.[42]

531.   Between the time of the 2014 complaint and September 2016, the MSU Defendants continued to hold Defendant Nassar out as a competent and safe physician.

532.   Plaintiff relied on the assertions of the MSU Defendants and several Plaintiff continued to seek treatment from Defendant Nassar in the wake of known concerns and dangers.

533.   Plaintiff was subjected to sexual assault, abuse, and molestation as a result of the MSU Defendants' fraudulent misrepresentations regarding Defendant Nassar.

534.   As a direct and/or proximate result of the MSU Defendants' fraudulent misrepresentations, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

535.   In the alternative, the actions or inaction of the Defendants was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and

---

[42] *See* Letter from U.S. Department of Education Office for Civil Rights to Michigan State University, September 1, 2015, OCR Docket #15-11-2098, #15-14-2113. Available at https://www2.ed.gov/documents/press-releases/michigan-state-letter.pdf. Last accessed January 4, 2017.

sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

## M.     COUNT FOURTEEN

### VIOLATIONS OF THE ELLIOT-LARSEN CIVIL RIGHTS ACT, MCL 37.2101 PLAINTIFF AGAINST DEFENDANTS NASSAR AND THE MSU DEFENDANTS

536. Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

537. The Elliot-Larsen Civil Rights Act ("Elliot-Larsen") prohibits discrimination based on sex. MCL 37.2102.

538. "Discrimination because of sex includes sexual harassment." MCL 37.2.103(i).

539. "Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature." MCL 37.2103(i).

540. Elliot-Larsen protects against sexual harassment in educational institutions.

541. MSU is an educational institution pursuant to MCL 37.2401.

542. An educational institution shall not "discriminate against an individual in the *full utilization of or benefit* from the institution, or the services, activities, or programs provided by the institution because of . . . sex." MCL 37.2401(a) (emphasis added).

543. Elliot-Larsen also protects against sexual harassment in places of public accommodation. MCL 37.2302. Under this section, an individual shall not be denied "full and equal

enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of . . . sex." MCL37.2302(a).

544.   MSU is a "place of public accommodation" because its "services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public." MCL 37.2301(a).

545.   Plaintiff is a "person" within the meaning of MCL 37.2103(g).

546.   Nassar's actions and conduct were carried out under one of MSU's programs, which provides medical treatment to students, athletes, and the general public, wherein MSU, through MSU Sport Medicine Clinic, solicits and markets to people like Plaintiff, and places Plaintiff within the University community.

547.   Nassar's actions and conduct toward Plaintiff denied her the full and equal enjoyment of MSU's services at a place of public accommodation, in violation of Elliot-Larson.

548.   Nassar's actions and conduct toward Plaintiff of nonconsensual sexual assault, battery, molestation, and rape, which includes unconsented touching and rubbing of Plaintiff's genitalia, breasts, and unconsented digital penetration of Plaintiff's vagina, constitute sex discrimination under Elliot-Larsen.

549.   As a direct and/or proximate result of the Defendant's actions and/or inactions, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to

be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

550.   In the alternative, the actions or inaction of the Defendant was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and has sustained and continues to sustain loss of earnings and earning capacity.

## VIII.      CLAIMS AGAINST USA GYMNASTICS

### A.      COUNT FIFTEEN

### CIVIL RICO 18 U.S.C. § 1964 AGAINST DEFENDANT USAG, DEFENDANT TWISTARS, DEFENDANT GEDDERT, AND DEFENDANT NASSAR

551.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

552.   Defendants USAG, Twistars, Geddert, and Nassar formed an enterprise (hereinafter "the Enterprise") by virtue of their agency relationships with each other in the area of competitive gymnastics.

553.   Through the Enterprise, Defendants USAG, Twistars, Geddert, and Nassar engaged in

racketeering activity to wit sex trafficking of children by fraud in violation of 18 U.S.C. § 1591.

554. Violations of 18 U.S.C. § 1591 are a "racketeering activity" as that term is defined in 18 U.S.C. § 1961(1).

555. The Enterprise created a financial benefit to each of the Defendants from participating in the venture. 18 U.S.C. § 1951(a)(2).

556. Defendant USAG knowingly received a financial benefit in the forms of membership fees, fame, and prestige from participating in the Enterprise.

557. Defendant Twistars and Defendant Geddert knowingly received a financial benefit in the forms of national and global exposure, fame, and increased enrollment from participating in the Enterprise.

558. Defendant Nassar knowingly obtained a financial benefit in the forms of national and global exposure, fame, and an increase in the number of patients treated, which in turn led to a higher salary, from participation in the Enterprise.

559. The purpose of the Enterprise in part was to create a system by which Defendant Nassar was enabled to engage in commercial sex acts with young athletes and gymnasts through a fraudulent representation that he was engaged in legitimate medical treatment.

560. The Enterprise engaged in fraud by either knowingly or with reckless disregard of the truth, affirmatively representing to gymnasts and the public at large that Defendant Nassar was a competent and ethical physician.

561. The Enterprise's fraudulent representations were used to cause all USA Gymnastics registered gymnasts and others to engage in commercial sex acts.

562. Through the Enterprise, Defendant Nassar was able to engage in commercial sex acts with

gymnasts throughout the United States and around the world, including at every Olympic game from approximately 1992 to 2012.

563.   The commercial sex acts involved Defendant Nassar's digital vaginal and anal penetration and touching of breasts of gymnasts in exchange for the gymnasts receiving some amount of medical treatment.

564.   Defendant Nassar received value from participating from the commercial sex acts in the form of sexual gratification.

565.   The commercial sex acts also conferred value to the Enterprise as described above.

566.   The conduct alleged in this complaint constitutes a "pattern of racketeering activity," as that term is defined in 18 U.S.C. § 1961(5) as Plaintiff has alleged more than two acts that constitute racketeering activity—specifically violations of 18 U.S.C. § 1591—that occurred after the enactment of the Racketeer Influenced and Corrupt Organizations Act and at least two racketeering activities occurred within the last 10 years.

567.   Defendants USAG, Twistars, and Geddert's actions aided and abetted Defendant Nassar in engaging in racketeering activity by giving Defendant Nassar access to countless young gymnasts through his role as team doctor and Defendants USAG, Twistars, and Geddert were generally aware of their role in the racketeering activity at the time they provided assistance and knowingly and substantially assisted Defendant Nassar in engaging in racketeering activity—specifically sex trafficking of children.

568.   As a direct and proximate cause of Defendants USAG, Twistars, Geddert, and Nassar's racketeering activities, Plaintiff suffered injury to her business or property because the sexual assaults caused her to either quit or retire from athletics prematurely effectively depriving her of the right to pursue business opportunities in the field of athletics or to

pursue college athletic scholarships and was prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity and requests treble damages and reasonable attorney fees. 18 U.S.C. § 1964(c).

## B.    COUNT SIXTEEN

### GROSS NEGLIGENCE
### AGAINST DEFENDANT USAG AND DEFENDANT NASSAR

569.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

570.   Defendant USAG owed the public and the Plaintiff a duty to use due care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents.

571.   The Plaintiff is or was a member of USAG, participated in USAG sanctioned events, and/or were knowledgeable of USAG and considered it to be a prestigious organization. In some cases, Plaintiff was referred to Defendant Nassar through USAG affiliations.

572.   Defendant Nassar owed Plaintiff a duty to use due care in his capacity as an employee, representative, and/or agent of Defendant USAG.

573.   By seeking medical treatment from Defendant Nassar in his capacity as an employee, agent, and/or representative of Defendant USAG, a special, confidential, and fiduciary relationship between Plaintiff and Defendant Nassar was created, resulting in Defendant Nassar owing Plaintiff a duty to use due care.

574.   Defendant USAG's failure to adequately supervise Defendant Nassar was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff.

575.   Defendant Nassar's conduct in sexually assaulting, abusing, and molesting Plaintiff under

the guise of rendering medical "treatment" as an employee, representative, and/or agent of Defendant USAG was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff.

576.   Defendant USAG's conduct demonstrated a willful disregard for necessary precautions to reasonably protect Plaintiff's safety.

577.   Defendant USAG's conduct as described above, demonstrated a willful disregard for substantial risks to Plaintiff.

578.   Defendant USAG breached duties owed to Plaintiff and were grossly negligent when they conducted themselves by actions described above, including but not limited to their failure to notify MSU about the reasons for Nassar's separation from USAG and more broadly the issues surrounding sexual abuse in gymnastics and warning signs and reporting requirements. Said acts were committed with reckless disregard for Plaintiff's health, safety, Constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

579.   As a direct and/or proximate result of Defendant USAG's actions and/or inactions, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depression, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

### C.      COUNT SEVENTEEN

### NEGLIGENCE AGAINST DEFENDANT USAG AND DEFENDANT NASSAR

580.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

581.   Defendant USAG owed the public and Plaintiff a duty of ordinary care to ensure their safety and freedom from sexual assault, abuse, and molestation while being treated by their employees, representatives, and agents.

582.   Plaintiff had a reasonable expectation that the USAG was recommending, employing, and holding out competent and ethical physicians and trainers for medical treatment who would carry out said treatment without sexual assault, abuse, and molestation.

583.   By seeking medical treatment from Defendant Nassar in his capacity as an employee, agent, and/or representative of Defendant USAG, a special, confidential, and fiduciary relationship between Plaintiff and Defendant Nassar was created, resulting in Defendant Nassar owing Plaintiff a duty to use ordinary care.

584.   Defendant Nassar owed Plaintiff a duty of ordinary care in carrying out medical treatment.

585.   Defendant USAG's failure to adequately train and supervise Defendant Nassar breached the duty of ordinary care.

586.   Defendant USAG's failure to properly investigate, address, and remedy complaints regarding Defendant Nassar's conduct was a breach of ordinary care.

587.   Defendant USAG's failure to inform Plaintiff and the public of the allegations and concerns leading to Defendant Nassar's separation from USAG was a breach of ordinary care.

588.   Defendant Nassar's conduct in sexually assaulting, abusing, and molesting Plaintiff was a breach of the duty to use ordinary care.

589.    As a direct and/or proximate result of Defendants' conduct, actions and/or inactions, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depression, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

D.    **COUNT EIGHTEEN**

**VICARIOUS LIABILITY AGAINST DEFENDANT USAG**

590.    Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs

591.    Vicarious liability is indirect responsibility imposed by operation of law where an employer is bound to keep its employees within their proper bounds and is responsible if it fails to do so.

592.    Vicarious liability essentially creates agency between the principal and its agent, so that the principal is held to have done what the agent has done.

593.    Defendant USAG's website contains sites portraying Defendant Nassar as the recipient of distinguished awards and boasts him as having been "instrumental" to the success of USA gymnastics.

594.    Defendant USAG employed and/or held Defendant Nassar out to be its agent and/or representative from approximately 1986 to 2015.

595.   Defendant USAG is vicariously liable for the actions of Defendant Nassar as described above that were performed during the course of his employment, representation, or agency with Defendant USAG and while he had unfettered access to young female athletes.

596.   As a direct and/or proximate cause of Defendant Nassar's negligence carried out in the course of his employment, agency, and/or representation with Defendant USAG, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity

E.   **COUNT NINETEEN**

**EXPRESS/IMPLIED AGENCY AGAINST DEFENDANT USAG**

597.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

598.   An agent is a person who is authorized by another to act on its behalf.

599.   Defendant USAG intentionally or negligently made representations that Defendant Nassar was their employee, agent, and/or representative.

600.   On the basis of those representations, Plaintiff reasonably believed Defendant Nassar was acting as an employee, agent, and/or representation of Defendant USAG.

601.   Plaintiff was injured as a result of Defendant Nassar's sexual assault, abuse, and

molestation as described above carried out through his employment, agency, and/or representation with Defendant USAG.

602. Plaintiff was injured because she relied on Defendant USAG to provide employees or agents who would exercise reasonable skill and care.

603. As a direct and/or proximate cause of Defendant Nassar's negligence carried out in the course of his employment, agency, and/or representation with Defendant USAG, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

F. **COUNT TWENTY**

**NEGLIGENT SUPERVISION AGAINST DEFENDANT USAG**

604. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs

605. Defendant USAG had a duty to provide reasonable supervision of its employee, agent, and/or representative, Defendant Nassar, while he was in the course of his employment, agency and/or representation of Defendant USAG and while he interacted with young female athletes including Plaintiff.

606. It was reasonably foreseeable given the known sexual abuse in youth sports and gymnastics

in particular that Defendant Nassar who had prior allegations against him had or would sexually abuse children, including Plaintiff, unless properly supervised.

607. Defendant USAG by and through their employees, agents, managers and/or assigns such as Mr. Penny or Mr. Colarossi, knew or reasonably should have known of Defendant Nassar's conduct and/or that Defendant Nassar was an unfit employee, agent, and/or representative because of his sexual interest in children and young adults.

608. Defendant USAG breached its duty to provide reasonable supervision of Defendant Nassar, and its failure permitted Defendant Nassar, who was in a position of trust and authority, to commit the acts against Plaintiff.

609. The aforementioned sexual abuse occurred while Defendant Nassar was acting in the course of his employment, agency and/or representation of Defendant USAG.

610. Defendant USAG tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel or discipline Defendant Nassar, with the result that Defendant Nassar was allowed to violate the rights of persons such as Plaintiff with impunity.

611. As a direct and/or proximate result of Defendant USAG's negligent supervision, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment

of life and has sustained and continues to sustain loss of earnings and earning capacity.

G.     **COUNT TWENTY-ONE**

 **NEGLIGENT FAILURE TO WARN OR PROTECT DEFENDANT USAG**

612.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

613.   Given the direct or indirect knowledge of sexual abuse in youth sports and in particular gymnastics, it was reasonably foreseeable that sexual abuse of minors may occur if proper procedures were not taken by Defendant USAG.

614.   Defendant USAG knew or should have known that Defendant Nassar posed a risk of harm to Plaintiff or those in Plaintiff's situation.

615.   Defendant USAG had direct and/or constructive knowledge as to the dangerous conduct of Defendant Nassar and failed to act reasonably and responsibly in response.

616.   Defendant USAG knew or should have known that Defendant Nassar previously committed sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

617.   Defendant USAG had a duty to warn or protect the public, Plaintiff, and others in Plaintiff's situation against the risk of injury by Defendant Nassar.

618.   The duty to disclose this information arose by the special, trusting, confidential, and fiduciary relationship between Defendant Nassar in his capacity as employee, agent, and/or representative of Defendant USAG and Plaintiff.

619.   Defendant USAG breached said duty by failing to warn the public and the Plaintiff and/or by failing to take reasonable steps to protect the public and the Plaintiff from Defendant Nassar.

620.    Defendant USAG breached its duties to protect Plaintiff by failing to detect and/or uncover evidence of sexual abuse and sexual assault, investigate Defendant Nassar, adjudicate and suspend and/or ban Defendant Nassar from USAG affiliation and USAG sanctioned events.

621.    Defendant USAG failed to adequately screen, counsel and/or discipline Defendant Nassar for physical and/or mental conditions that might have rendered him unfit to discharge the duties and responsibilities of a physician in his capacity as an employee, agent, and/or representative of Defendant USAG, resulting in violations of Plaintiff's rights.

622.    Defendant USAG willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiff from Defendant Nassar's conduct.

623.    As a direct and/or proximate result of Defendant USAG's negligent failure to warn or protect, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and has sustained and continues to sustain loss of earnings and earning capacity.

### H.    COUNT TWENTY-TWO

### NEGLIGENT FAILURE TO TRAIN OR EDUCATE
### AGAINST DEFENDANT USAG

624.    Plaintiff realleges and incorporates by reference the allegations contained in the previous

paragraphs

625. Defendant USAG breached its duty to take reasonable protective measures to protect the public and Plaintiff from the risk of sexual abuse and/or sexual assault by Defendant Nassar, such as the failure to properly train or educate Plaintiff and other individuals (including minors) about how to avoid such a risk.

626. Defendant USAG failed to implement reasonable safeguards to:

    a. Prevent acts of sexual assault, abuse, and molestation by Defendant Nassar;

    b. Avoid placing Defendant Nassar in positions where he would be in unsupervised contact and interaction with Plaintiff and other young athletes.

627. As a direct and/or proximate result of Defendant USAG's negligent failure to train or educate, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and has sustained and continues to sustain loss of earnings and earning capacity.

I.     **COUNT TWENTY-THREE**

**NEGLIGENT RETENTION AGAINST DEFENDANT USAG**

628. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

629. Defendant USAG had a duty when credentialing, hiring, retaining, screening, checking,

regulating, monitoring, and supervising employees, agents and/or representatives to exercise due care, but they failed to do so.

630.   Defendant USAG was negligent in the retention of Defendant Nassar as an employee, agent, and/or representative in their failure to adequately investigate, report, and address complaints about his conduct of which they knew or should have known.

631.   Defendant USAG was negligent in the retention of Defendant Nassar when after they discovered, or reasonably should have discovered Defendant Nassar's conduct which reflected a propensity for sexual misconduct.

632.   Defendant USAG's failure to act in accordance with the standard of care resulted in Defendant Nassar gaining access to and sexually abusing and/or sexually assaulting Plaintiff as well as an unknown number of other individuals.

633.   The aforementioned negligence in the credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising of Defendant Nassar created a foreseeable risk of harm to Plaintiff as well as other minors and young adults.

634.   As a direct and/or proximate result of Defendant USAG's negligent retention, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and has sustained and continues to sustain loss of earnings and earning capacity.

J.      **COUNT TWENTY-FOUR**

**FRAUD AND MISREPRESENTATION AGAINST DEFENDANT USAG**

635.    Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

636.    From approximately 1992 to summer 2015, Defendant USAG represented to Plaintiff and the public that Defendant Nassar was a competent, ethical, and safe physician.

637.    By representing that Defendant Nassar was a team physician and athletic physician at Defendant MSU and a National Team Physician with Defendant USAG, Defendant USAG represented to Plaintiff and the public that Defendant Nassar was safe, trustworthy, of high moral and ethical repute, and that Plaintiff and the public need not worry about being harmed by Defendant Nassar.

638.    The representations were false when they were made as Defendant Nassar had and was continuing to sexually assault, abuse, molest and rape Plaintiff and an unknown number of other individuals.

639.    Additionally, complaints were made to Defendant USAG, yet Defendant USAG did not contact Plaintiff, the MSU Defendants, or any other clubs, or organizations affiliated with Defendant Nassar to inform them of the allegations and potential harm to Plaintiff and others.

640.    Plaintiff relied on the assertions of Defendant USAG and Plaintiff continued to seek treatment of Defendant Nassar in the wake of known concerns and dangers.

641.    Plaintiff was subjected to sexual assault, abuse, and molestation as a result of Defendant USAG's fraudulent misrepresentations regarding Defendant Nassar.

642.    As a direct and/or proximate result of Defendant USAG's fraud and misrepresentation,

Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and has sustained and continues to sustain loss of earnings and earning capacity.

## IX.      CLAIMS AGAINST TWISTARS

## A.      COUNT TWENTY-FIVE

### GROSS NEGLIGENCEAGAINST DEFENDANT TWISTARS, NASSAR, AND GEDDERT

643.  Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

644.  Defendant Twistars and Defendant Geddert owed the public and the Plaintiff a duty to use due care to ensure their safety and freedom from sexual assault, abuse, molestation and rape while interacting with their employees, representatives, and/or agents.

645.  Defendant Nassar owed Plaintiff a duty to use due care as an employee, representative, and/or agent of Defendant Twistars.

646.  By seeking medical treatment from Defendant Nassar in his capacity as an employee, agent, and/or representative of Defendant Twistars, a special, confidential, and fiduciary relationship between Plaintiff and Defendant Nassar was created, resulting in Defendant Nassar owing Plaintiff a duty to use due care.

647.  Given known sexual abuse which has taken place in youth sports including gymnastics and

the reasonable foreseeability that harm may occur to athletes, Defendant Twistars and Defendant Geddert not only referred athletes to Defendant Nassar but also failed to adequately supervise Defendant Nassar. Defendants' actions were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff.

648. Defendant Nassar's conduct in sexually assaulting, abusing, molesting and raping Plaintiff in the course of his employment, agency, and/or representation of Defendant Twistars and under the guise of rendering medical "treatment" as an employee, representative, and/or agent of Defendant Twistars was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff.

649. Defendant Twistars' conduct and the conduct of Defendant Geddert demonstrated a willful disregard for precautions to ensure Plaintiff's safety.

650. Defendant Twistars' conduct and the conduct of Defendant Geddert as described above, demonstrated a willful disregard for substantial risks to Plaintiff.

651. Defendant Twistars and Defendant Geddert breached duties owed to Plaintiff and were grossly negligent when they conducted themselves by actions described above, said acts having been committed with reckless disregard for Plaintiff's health, safety, Constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

652. As a direct and/or proximate result of Defendants' gross negligence, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries

including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and has sustained and continues to sustain loss of earnings and earning capacity.

**B.**     **COUNT TWENTY-SIX**

**NEGLIGENCE AGAINST DEFENDANTS TWISTARS,
NASSAR, AND GEDDERT**

653. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

654. In 1992, Plaintiff and her coach complained to MSU Defendants about Defendant Nassar sexually assaulting and raping her, but Defendants concealed it and indicated that this was already known to them.

655. In or around 1998, a parent of a gymnast at Defendant Twistars' facility complained to Defendant Geddert, the owner and operator of Defendant Twistars, regarding Dr. Nassar's conduct alleging sexual abuse, assault, and molestation.

656. Despite being informed of Defendant Nassar's conduct, Defendant Geddert recommended Defendant Nassar as a physician to members and guests of Defendant Twistars.

657. Defendant Geddert owed Plaintiff a duty of ordinary care to ensure their safety and freedom from sexual assault, abuse, and molestation.

658. In recommending Defendant Nassar with knowledge of Defendant Nassar's conduct, Defendant Geddert breached the duty of ordinary care to Plaintiff and the public.

659. Defendant Twistars breached the duty of ordinary care to Plaintiff and the public in failing to investigate the 1998 allegations which were made to Defendant Geddert.

124

660. Defendant Twistars and Defendant Geddert breached the duty of ordinary care to Plaintiff and the public by failing to report the 1998 allegations, which were made to Defendant Geddert, to law enforcement.

661. Plaintiff, as a member of the public, in taking the recommendation of Defendant Geddert to seek medical treatment from Defendant Nassar had a reasonable expectation that Defendant Nassar would carry out medical treatment without subjecting them to sexual assault, abuse, or molestation.

662. By seeking medical treatment from Defendant Nassar, a special, confidential, and fiduciary relationship between Plaintiff and Defendant Nassar was created, resulting in Defendant Nassar owing Plaintiff a duty to use ordinary care.

663. Defendant Nassar owed Plaintiff a duty of ordinary care in carrying out medical treatment at Defendant Twistars' facilities.

664. Defendant Twistars' failure to adequately train and supervise Defendant Nassar while he was at their facility breached the duty of ordinary care.

665. Defendant Nassar's conduct at Defendant Twistars' facility, in sexually assaulting, abusing, and molesting Plaintiff in the course of and under the guise of rendering medical "treatment" was a breach of the duty to use ordinary care.

666. As a direct and/or proximate result of Defendants' negligence, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and

physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity.

## C.   COUNT TWENTY-SEVEN

### EXPRESS/IMPLIED AGENCY
### AGAINST DEFENDANTS TWISTARS AND GEDDERT

667.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

668.   An agent is a person who is authorized by another to act on its behalf.

669.   Defendant Twistars intentionally or negligently made representations that Defendant Nassar was their employee, agent, and/or representative.

670.   On the basis of those representations, Plaintiff reasonably believed that Defendant Nassar was acting as an employee, agent, and/or representative of Defendant Twistars.

671.   Plaintiff was injured as a result of Defendant Nassar's sexual assault, abuse, and molestation as described above.

672.   Plaintiff was injured because they relied on Defendant Twistars to provide employees, agents, and/or representatives who would exercise reasonable skill or care.

673.   As a direct and/or proximate result of Defendant Twistars' negligent failure to train or educate, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders,

nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and has sustained and continues to sustain loss of earnings and earning capacity.

D.     **COUNT TWENTY-EIGHT**

**NEGLIGENT SUPERVISION**
**AGAINST DEFENDANTS TWISTARS AND GEDDERT**

674.    Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

675.    Defendant Twistars and Defendant Geddert each had a duty to provide reasonable supervision of its employee, agent, and/or representative, Defendant Nassar, while he was in the course of his employment, agency, or representation of Defendant Twistars when he interacted with young female athletes including Plaintiff.

676.    It was reasonably foreseeable given the known sexual abuse in youth sports and gymnastics in particular that Defendant Nassar who had prior allegations against him had or would sexually abuse children and young women, including Plaintiff, unless properly supervised.

677.    Defendant Twistars by and through their employees, agents, managers, and/or assigns, and in particular by Defendant Geddert, knew or reasonably should have known of Defendant Nassar's conduct and/or that Defendant Nassar was an unfit employee, agent, and/or representative because of his sexual interest in children and young adults and due to the complaints prior to 1992 and 1998 complaint made to Defendant Geddert of the nonconsensual sexual touching during "treatment."

678.    Defendant Twistars and Defendant Geddert breached their duty to provide reasonable

supervision of Defendant Nassar, and permitted Defendant Nassar, who was in a position of trust and authority, to commit the acts against Plaintiff.

679.   The aforementioned sexual abuse occurred while Plaintiff and Defendant Nassar were on the premises of Defendant Twistars, and while Defendant Nassar was acting in the course of his employment, agency, or representation of Defendant Twistars.

680.   Defendant Twistars and Defendant Geddert tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, with the result that Defendant Nassar was allowed to violate the rights of persons such as Plaintiff with impunity.

681.   As a direct and/or proximate result of Defendants' negligent failure to supervise, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and has sustained and continues to sustain loss of earnings and earning capacity.

E.   **COUNT TWENTY-NINE**

**NEGLIGENT FAILURE TO WARN OR PROTECT
AGAINST DEFENDANTS TWISTARS AND GEDDERT**

682.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

683.   Defendant Twistars and Defendant Geddert knew or should have known that Defendant

Nassar posed a risk of harm to Plaintiff or those in Plaintiff's situation.

684.  As early as 1992 and then again in 1998, Defendant Twistars, by a complaint made to its owner/employee/agent/representative Defendant John Geddert, had direct and/or constructive knowledge as to the dangerous conduct of Defendant Nassar and failed to act reasonably and responsibly in response.

685.  Defendant Twistars and Defendant Geddert knew or should have known that Defendant Nassar committed sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

686.  Defendant Twistars and Defendant Geddert had a duty to warn or protect Plaintiff and others in Plaintiff's situation against the risk of injury by Defendant Nassar.

687.  The duty to disclose this information arose by the special, trusting, confidential, and fiduciary relationship between Defendant Nassar, an agent/representative/employee of Defendant Twistars and Plaintiff.

688.  Defendant Twistars and Defendant Geddert breached said duty by failing to warn Plaintiff and/or by failing to take reasonable steps to protect Plaintiff from Defendant Nassar.

689.  Defendant Twistars and Defendant Geddert breached its duties to protect Plaintiff by failing to detect and/or uncover evidence of sexual abuse and sexual assault, which was taking place on its premises and at its facility.

690.  Defendant Twistars and Defendant Geddert breached its duties to protect Plaintiff by failing to investigate Defendant Nassar, adjudicate and suspend and/or ban Defendant Nassar from Twistars sanctioned events.

691.  Defendant Twistars and Defendant Geddert failed to adequately screen, counsel, and/or discipline Defendant Nassar for physical and/or mental conditions that might have rendered

him unfit to discharge the duties and responsibilities of a physician with their organization, resulting in violations of Plaintiff's rights.

692.  Defendant Twistars and Defendant Geddert willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiff from Defendant Nassar's conduct.

693.  As a direct and/or proximate result of Defendants' negligent failure to warn or protect, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and has sustained and continues to sustain loss of earnings and earning capacity.

F.    **COUNT THIRTY**

**FRAUD AND MISREPRESENTATION
AGAINST DEFENDANT TWISTARS**

694.  Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

695.  From approximately 1992 to September 2016, Defendant Twistars and Defendant Geddert represented to Plaintiff and the public that Defendant Nassar was a competent, ethical, and safe physician.

696.  By representing that Defendant Nassar was a team physician and athletic physician at Defendant MSU and a National Team Physician with Defendant USAG, Defendant

Twistars and Defendant Geddert represented to Plaintiff and the public that Defendant Nassar was safe, trustworthy, of high moral and ethical repute, and that Plaintiff and the public need not worry about being harmed by Defendant Nassar.

697.  The representations were false when they were made as Defendant Nassar had and was continuing to sexually assault, abuse, and molest Plaintiff and an unknown number of individuals, at times at Defendant Twistars' facility.

698.  As early as 1992, Defendant Twistars and Defendant Geddert knew their representations of Defendant Nassar were false as Defendant Twistars and Defendant Geddert received a complaint of Defendant Nassar's conduct.

699.  Between the time of the 1998 complaint and September 2016, Defendant Twistars and Defendant Geddert continued to hold Defendant Nassar out as a competent and safe physician.

700.  Plaintiff relied on the assertions of Defendants Twistars and Defendant Geddert and several Plaintiffs continued to seek treatment of Defendant Nassar in the wake of known concerns and dangers.

701.  Plaintiff was subjected to sexual assault, abuse, and molestation as a result of Defendant Twistars' and Defendant Geddert's fraudulent misrepresentations regarding Defendant Nassar.

702.  As a direct and/or proximate result of Defendants' fraud and misrepresentation, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically

manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and has sustained and continues to sustain loss of earnings and earning capacity.

## X.      CLAIMS AGAINST NASSAR

### A.      COUNT THIRTY-ONE

### ASSAULT & BATTERY
### PLAINTIFF AGAINST DEFENDANT LAWRENCE NASSAR

703.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs

704.   The acts committed by Defendant Nassar against Plaintiff described herein constitute assault and battery, actionable under the laws of Michigan.

705.   Defendant Nassar committed nonconsensual sexual acts which resulted in harmful or offensive contact with the body of the Plaintiff.

706.   Specifically, Defendant Nassar committed acts which caused injury to Plaintiff by subjecting her to an imminent battery and/or intentional invasions of her right to be free from offensive and harmful contact, and said conduct demonstrated that Defendant Nassar had a present ability to subject Plaintiff to an immediate, intentional, offensive and harmful touching.

707.   Defendant Nassar assaulted and battered Plaintiff by nonconsensual and unwanted digital vaginal penetration, digital anal penetration, touching, kissing and sucking of Plaintiff's breasts without notice or explanation of the "treatment" and raping her.

708.   Plaintiff did not consent to the contact, which caused injury, damage, loss, and/or harm.

709.   As a direct and/or proximate result of the Defendant Nassar's actions and/or inactions,

Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and has sustained and continues to sustain loss of earnings and earning capacity.

710.    In the alternative, the actions or inaction of Defendant Nassar was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and has sustained and continues to sustain loss of earnings and earning capacity.

B.    **COUNT THIRTY-TWO**

**INVASION OF PRIVACY**
**PLAINTIFF AGAINST DEFENDANT NASSAR AND THE MSU DEFENDANTS**

711.    Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

712.   Defendant Nassar intruded upon Plaintiff's seclusion or solitude by sexually assaulting, abusing, molesting and raping Plaintiff without the consent of Plaintiff.

713.   Plaintiff's genital area, breasts, and sexual activity are secret and private subject matters.

714.   Plaintiff possessed a right to keep these subject matters private.

715.   Plaintiff lost her virginity when Defendant Nassar sexually assaulted, abused, molested and raped her.

716.   Defendant Nassar videotaped these assaults, batteries and invasion of privacy.

717.   Defendant Nassar's method of sexually assaulting, abusing, molesting and raping Plaintiff is objectionable to a reasonable person.

718.   As a direct and/or proximate result of the Defendant's actions and/or inactions, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and has sustained and continues to sustain loss of earnings and earning capacity.

719.   In the alternative, the actions or inaction of the Defendant was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional

distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of

enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries

including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and

physical injuries. Plaintiff was prevented and will continue to be prevented from

performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has

sustained and continues to sustain loss of earnings and earning capacity.

## XI.  CLAIMS AGAINST DEFENDANTS KLAGES, STRAMPEL, KOVAN, AND STOLLAK

### A.  COUNT THIRTY-THREE

### FAILURE TO REPORT CHILD ABUSE
### PLAINTIFF AGAINST DEFENDANTS KLAGES, STRAMPEL, KOVAN, AND STOLLAK

720.  Plaintiff realleges and incorporates by reference the allegations contained in the previous

paragraphs.

721.  Michigan's Child Protection Law, MCL 722.621 *et seq*., establishes mandatory reporting

guidelines for suspected child abuse or neglect and provides penalties for failure to report

child abuse or neglect.

722.  Specifically, MCL 722.623 provides in pertinent part:

A **physician**, dentist, physician's assistant, registered dental hygienist, medical examiner, nurse, person licensed to provide emergency medical care, audiologist, **psychologist**, marriage and family therapist, licensed professional counselor, social worker, licensed master's social worker, licensed bachelor's social worker, registered social service technician, social service technician, a person employed in a professional capacity in any office of the friend of the court, **school administrator**, **school counselor or teacher**, law enforcement officer, member of the clergy, or regulated child care provider **who has reasonable cause to suspect child abuse or child neglect shall make an immediate report** to centralized intake by telephone, or, if available, through the online reporting system, of

the suspected child abuse or child neglect. [Emphasis added.]

723.  Child abuse is defined as "harm or threatened harm to a child's health or welfare that occurs through nonaccidental physical or mental injury, sexual abuse, sexual exploitation, or maltreatment, by a parent, a legal guardian, or any other person responsible for the child's health or welfare or by a teacher, a teacher's aide, or a member of the clergy."  MCL 722.622(g).

724.  Child neglect is defined as "harm or threatened harm to a child's health or welfare by a by a parent, a legal guardian, or any other person responsible for the child's health or welfare that occurs through either of the following: (*i*) Negligent treatment, including the failure to provide adequate food, clothing, shelter, or medical care. (*ii*) Placing a child at an unreasonable risk to the child's health or welfare by failure of the parent, legal guardian, or any other person responsible for the child's health or welfare to intervene to eliminate that risk when that person is able to do so and has, or should have, knowledge of the risk." MCL 722.622(k).

725.  Under MCL 722.633(1), "A person who is required by this act to report an instance of suspected child abuse or neglect and who fails to do so is civilly liable for the damages proximately caused by the failure."

726.  Defendants Klages, Strampel, Kovan, and Stollak were mandatory reporters during the time Defendant Nassar was engaged in child abuse or child neglect.

727.  As established in the allegations above, Defendants Klages, Strampel, Kovan, and Stollak had reasonable cause to suspect child abuse or child neglect.

728.  Defendant Klages, Strampel, Kovan, and Stollak failed to report any instances of suspected child abuse or neglect.

729.  Defendants Klages, Strampel, Kovan, and Stollak are or were employed by Defendants

Michigan State University and Michigan State University Board of Trustees during the time Defendant Nassar was engaged in child abuse or child neglect and were acting in the scope and course of their employment when they failed to report any instances of suspected child abuse or neglect.

730. Defendants Klages, Strampel, Kovan, and Stollak are directly civilly liable for the damages proximately caused by their failure to report any instances of suspected child abuse or neglect. Defendants Michigan State University and Michigan State University Board of Trustees are vicariously liable for said damages.

731. As a direct and/or proximate result of the Defendants' actions and/or inactions, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and has sustained and continues to sustain loss of earnings and earning capacity.

732. In the alternative, the actions or inaction of the Defendants were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief,

humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life and has sustained and continues to sustain loss of earnings and earning capacity.

## I.   XIII.   DAMAGES - FOR ALL AFOREMENTIONED CAUSES OF ACTION

733.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs

734.   As a or the direct and/or proximate result of Defendants' conduct, actions, or inactions, Plaintiff has suffered and continues to suffer pain and suffering, pregnancy and miscarriage and sequelae thereto, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity.

735.   The conduct, actions and/or inactions of Defendants as alleged in the above stated counts and causes of action constitute violations of Plaintiff's Constitutional and Federal rights as well as the common and/or statutory laws of the State of Michigan, and the United States District Court has jurisdiction to hear and adjudicate said claims.

736.   In whole or in part, as a result of some or all of the above actions and/or inactions of

Defendants, Plaintiff has and continues to suffer irreparable harm as a result of the violations.

737. The amount in controversy for each Plaintiff exceeds the jurisdictional minimum of $75,000.00.

WHEREFORE, Plaintiff requests this Court and the finder of fact to enter a Judgment in Plaintiff's favor against all named Defendants on all counts and claims as indicated above in an amount consistent with the proofs of trial, and seeks against Defendants all appropriate damages arising out of law, equity, and fact for each or all of the above counts where applicable and hereby requests that the trier of fact, be it judge or jury, award Plaintiff all applicable damages, including but not limited to compensatory, special, exemplary and/or punitive damages, in whatever amount the Plaintiff is entitled, and all other relief arising out of law, equity, and fact, also including but not limited to:

a) Compensatory damages in an amount to be determined as fair and just under the circumstances, by the trier of fact including, but not limited to medical expenses, loss of earnings, mental anguish, anxiety, humiliation, and embarrassment, violation of Plaintiff's Constitutional, Federal, and State rights, loss of social pleasure and enjoyment, and other damages to be proved;

b) Punitive and/or exemplary damages in an amount to be determined as reasonable or just by the trier of fact;

c) Reasonable attorney fees, interest, and costs; and,

d) Other declaratory, equitable, and/or injunctive relief, including, but not limited to implementation of institutional reform and measures of accountability to ensure the safety and protection of young athletes and other individuals, as appears to be reasonable and just.

**Respectfully Submitted,**

Dated: September 7, 2018

/s/ Steven C. Hurbis
**Brian J. McKeen (P34123)**
**Steven C. Hurbis (P80993)**
McKeen & Associates, P.C.
Attorneys for Plaintiff
645 Griswold Street
Suite 4200
Detroit, MI 48226
Ph.: (313) 961-4400
E:bjmckeen@mckeenassociates.com
E:shurbis@mckeenassociates.com

/s/ Krystal A. Crittendon, Esq.

**Krystal A. Crittendon, Esq. (P49981)**

/s/ Jordan K. Merson, Esq.
**Jordan K. Merson, Esq.**
To be Admitted **Pro Hac Vice**
Merson Law, PLLC
Attorneys for Plaintiff
150 East 58th Street, 34th Floor
New York, NY 10155
Ph.: (212) 603-9100
E: jmerson@mersonlaw.com

## JURY DEMAND

Plaintiff, by and through her attorneys, McKeen and Associates, P.C., Krystal A.

Crittendon, Esq., and Merson Law, PLLC hereby demand a trial by jury on all claims set forth

above.

**Respectfully Submitted,**

Dated: September 7, 2018

/s/ Steven C. Hurbis
**Brian J. McKeen (P34123)**
**Steven C. Hurbis (P80993)**
McKeen & Associates, P.C.
Attorneys for Plaintiff
645 Griswold Street
Suite 4200

/s/ Krystal A. Crittendon, Esq.

**Krystal A. Crittendon, Esq. (P49981)**

/s/ Jordan K. Merson, Esq.
**Jordan K. Merson, Esq.**
To be Admitted **Pro Hac Vice**
 Merson Law, PLLC
 Attorneys for Plaintiff
 150 East 58th Street, 34th Floor
 New York, NY 10155
 Ph.: (212) 603-9100
 E: jmerson@mersonlaw.com